[Civ. No. 36413. Second Dist., Div. One. Feb. 8, 1971.]

SALIBA-KRINGLEN CORP. et al., Plaintiffs and Appellants, v. ALLEN ENGINEERING CO., Defendant and Appellant.

### COUNSEL

Samuel D. Hale, Jr., Gill & Baldwin and Leroy M. Gire for Plaintiffs and Appellants.

Shapiro & Maguire, Grant & Popovich and Irvin Grant for Defendant and Appellant.

### OPINION

**GUSTAFSON, J.**—Plaintiffs consist of an individual, a corporation and a partnership acting as joint venturers in the business of a licensed general contractor and will hereinafter be referred to collectively as the general contractor. Defendant is a corporation doing business as a licensed electrical contractor.

The general contractor submitted a bid in the amount of $8,590,118.75 to the State of California for certain freeway construction and was awarded the contract. Defendant had submitted to the general contractor the low bid in the amount of $217,129 to perform the electrical work as a subcontractor. Defendant refused to perform the electrical work and the general contractor engaged another electrical contractor to perform that work at a cost of $40,871 more than defendant's bid. By this action, the general

contractor sought to recover the $40,871 from the defendant and was awarded half that amount ($20,435). Both parties appeal, the general contractor claiming that it was entitled to $40,871 and the defendant claiming that the general contractor was entitled to nothing.

■ "A promise which the promissor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise." (Rest., Contracts, § 90.) This principle is applicable to a proposed sub-contractor (promisor) who makes a bid (and with it an implied subsidiary promise to keep the bid open for a reasonable time after the awarding of the general contract) to a general contractor (promisee) who in turn bids on a construction contract with a third person in reliance upon the sub-contractor's bid (and subsidiary promise) and is the successful bidder. (*Drennan* v. *Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757].) The principal question on appeal is whether the trial court properly applied the rule to the facts in this case.

## The Facts

Sealed bids by general contractors were scheduled to be opened by the State of California at 2 p.m., July 9, 1964. Bids usually are not submitted until immediately preceding the scheduled opening time. Proposed sub-contractors and suppliers of materials are unwilling to make their bids to a general contractor until immediately preceding the time set for the opening of the general contractors' bids. This reluctance stems principally from the fact that if a proposed subcontractor or supplier of materials submits his bid many hours in advance, the general contractor will have an opportunity to use that bid in an attempt to persuade another subcontractor or supplier of materials to lower his bid to a figure lower than the figure quoted by the first proposed subcontractor or supplier of materials. Thus it is customary, as was the case here, for the general contractors to receive bids from proposed subcontractors and suppliers of materials only an hour or two before the opening of the general contractors' bids, thereby placing the general contractors in the position of having all they can do to record the bids, prepare their own written bids and get them filed by the deadline.

The general contractor in this case determined that bids from proposed subcontractors should be received no later than noon in order to be con-sidered. An employee of defendant whose duty it was to prepare the bid for the electrical work used a set of plans reduced in size to one-half of the size of the original set of plans. Thus a line on the original set of plans which indicated a length of 20 feet appeared on the half scale set of plans

to indicate a length of 10 feet. A substantial quantity of conduit and wire was called for by the plans. Defendant's employee used a ruler to determine how many feet of conduit and wire were called for by the plans. When he ascertained the total footage, he forgot to double the figure as he should have done because he was working from half scale plans, even though he was accustomed to working from half scale plans and he knew that these plans were half scale. As a result of the failure to double the footage for conduit and wire, defendant ascertained that it could do the electrical work for $217,129 which was approximately $55,000 below the figure it would have used had its employee not forgotten to double the footage for conduit and wire.

Shortly before noon on July 9, 1964, a secretary employed by defendant telephoned numerous general contractors who were seeking the contract with the state and told each of them that defendant's bid for the electrical subcontract was $217,129. The general contractor in this case received defendant's bid about noon.

When the secretary had completed her calls, she received telephone calls from some of those with whom she had placed bids requesting that defendant's bid be checked again because it seemed to be out of line with bids from other proposed electrical subcontractors. The secretary was unable to do anything about these requests until someone with authority returned to the office from lunch. An officer of defendant returned from lunch after 1 p.m., became convinced that defendant's bid was at least $50,000 too low (although he then did not know the reason), and made the decision to withdraw the bid. The general contractor in this case received word at 1:50 p.m. at its office that defendant was withdrawing its bid because of an error.

When the general contractor received defendant's bid shortly before noon, it was compared with three other bids for electrical work in the amounts of $265,543, $270,381 and $299,962. Using defendant's bid for the electrical work, the general contractor calculated its bid to the state, reduced it to writing and delivered the sealed envelope containing the bid to the appropriate state office at 1 p.m. Ten minutes elapsed between the time when defendant telephoned the general contractor's office to withdraw the bid and the time when the sealed envelopes containing the bids were opened 20 miles away in a state office.

### Contractor's Reliance Upon Defendant's Bid

■ Defendant claims that the general contractor in its bid to the state did not rely on defendant's bid to do the electrical work and that the trial court's finding that the general contractor relied on defendant's bid is not

supported by the evidence. Defendant claims that the general contractor did not rely on *any* bid of a proposed supplier or a proposed subcontractor.

The evidence discloses that the general contractor was successful in entering into contracts with most suppliers and subcontractors at prices lower than the bid prices. Sometimes the contract negotiated for a lower price was with the original low bidder and sometimes it was not. Defendant claims that by this conduct the general contractor entered into contracts with subcontractors and suppliers for a total of $89,156.67 less than the lowest bid prices. The general contractor denies that this figure represents an increase in its profits due solely to its negotiations because some of the contracts reflected changes in the work to be done or the materials to be supplied from what was called for from prospective subcontractors and suppliers at bid time. Although the trial court made no finding of the exact amount of money by which the general contractor increased its profits by negotiations, the record is clear that it was a substantial amount.

But the fact that the general contractor with respect to a given item did not enter into a contract with the lowest bidder at the price of that bid is not evidence that the general contractor did not rely on that bid. It is simply evidence that if the general contractor was able to get a better price either from the original lowest bidder or from someone else, the general contractor did so.

The facts of this case demonstrate precisely in what way the general contractor relied upon the bids of prospective subcontractors. As already indicated, the general contractor entered into several subcontracts at less than the original bid price, sometimes with the original bidder and sometimes not. In at least one case, the general contractor entered into a subcontract with someone who did not make the low bid, but at the exact price of the low bid. But in no case did the general contractor ever enter into a contract with a subcontractor or supplier at a price higher than the low bid. It is thus quite clear from the record that unless the general contractor negotiated a contract with another subcontractor or supplier at or below the low bid, the contract was made with the low bidder. Therefore it is obvious that the general contractor relied upon the low bids in the sense that those bids provided a protective ceiling on the cost of work to be contracted out to subcontractors and of supplies to be obtained from materialmen.

### Reasonableness of General Contractor's Reliance

If the general contractor had reason to believe that defendant's bid was in error, it could not justifiably rely on it. (*Drennan* v. *Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757].) ■ Defendant asserts that there was no

substantial evidence to support the finding of the court that the general contractor "did not know and did not have reason to know that there was any error or mistake in" defendant's bid.

Defendant claims that the general contractor should have known that there was an error in defendant's bid because defendant's bid was 19 percent lower than the next lowest bid. But the evidence shows that the general contractor was not possessed of knowledge of what a proper bid for the electrical work would be. It was not unusual for the general contractor to receive a bid for electrical work which was from 10 to 40 percent below the next highest bid. A retired general manager of a general contractor with vast experience in bidding testified that he would have had no reason to suspect that there was any error in defendant's bid.

Defendant seems to contend that a difference in bids of a given percentage should indicate that the low bid is in error. We find no basis for concluding that this is so. In the first place, the difference may indicate that the high bid is too high rather than that the low bid is too low. The figures themselves do not indicate which is the case. In the second place, a percentage difference may represent an insignificant amount of money or a substantial amount of money depending upon the magnitude of the bids. Whether a general contractor is entitled to rely upon the bid of a proposed subcontractor must be decided on the basis of the facts involved in the particular case before the court.

### Detriment to General Contractor

Defendant urges that for several reasons the general contractor's reliance upon defendant's bid did not induce action of a definite and substantial character on the part of the general contractor.

#### 1. General contractor's opportunity to withdraw bid before bids were opened.

Defendant notified the general contractor by telephone at 1:50 p.m. on July 9, 1964, that its bid was withdrawn because of an error.[1] Defend-

[1]Had no third party (the state) been involved, the promisee could not have held the promisor to its bid even though it was accepted if an error of the promisor in making the bid was such as to entitle the promisor to be relieved of its bid. But the many cases cited by defendant for this proposition (see, e.g., *Elsinore Union etc. Sch. Dist.* v. *Kastorff* (1960) 54 Cal.2d 380 [6 Cal.Rptr. 1, 353 P.2d 713]; *M. F. Kemper Const. Co.* v. *City of L.A.* (1951) 37 Cal.2d 696 [235 P.2d 7]) are inapposite in this context because here a third party (to whom the original promisee in turn made a bid) is involved. This additional factor decidedly alters the equities of the case. For the general contractor cannot easily and without hazard to himself withdraw his bid, and his detrimental reliance is far more substantial than in the two-party cases cited

ant asserts that the proper course of conduct would have been for someone in the general contractor's office to make a telephone call to the office where the bids were to be opened requesting that the general contractor's representative at that office withdraw the general contractor's bid. Withdrawal could have been made only by a written request executed by the bidder or his duly authorized representative and filed with the Director of Public Works or the chief of the division under which the work was to be performed. (Gov. Code, § 14316.)

The trial court found that the general contractor "did not have a reasonable opportunity after Defendant's telephone call at or about 1:50 PM and prior to 2 PM July 9, 1964, to revoke, withdraw, or modify" the general contractor's bid. This finding is supported by substantial evidence. The person in the general contractor's office who received defendant's telephone call did not know that a representative of the general contractor was at the state office where bids were to be opened and, had he known that a representative was in fact there, he did not know how to reach the representative by telephone.

Moreover, defendant's claim ignores the fact that mere withdrawal of the general contractor's bid would not necessarily have averted damage to the general contractor. It is of course true that upon learning of and considering the effect of the withdrawal of the defendant's bid, the general contractor, had there been enough time, might have submitted a revised bid and the revised bid might have been the successful one. It is also true that on a project of a magnitude of over $8,000,000, a profit of 5 percent would represent over $400,000, and that the general contractor's profit at that rate would have been reduced less than $2,500 if a revised bid had been submitted on the basis of the proposal made by the next lowest bidding electrical subcontractor.

But clearly there was no opportunity for the general contractor to submit a revised bid. The general contractor's bid in the amount of $8,590,118.75 was accompanied by the required bidder's bond (Gov. Code, § 14314) in the amount of $859,011.85. Even had there been time to withdraw the bid which was made, it is entirely unrealistic to believe that the general contractor in the space of a few minutes could have prepared a revised bid and obtained a new bidder's bond in the appropriate amount.

by defendant. Furthermore, the promisee does not enjoy here the benefit of an inequitable bargain as in the cases relied upon by defendant. Had the defendant performed, it would have been the state, not the general contractor, which would have benefited from defendant's mistake.

### 2. *Withdrawal of general contractor's bid after bids were opened.*

■ Defendant asserts that the general contractor was required at the very least to seek to be relieved of its bid to the state on the basis of the mistake made by the defendant. There is no merit to this contention.

To be relieved of its bid, the general contractor would first have had to give five days' written notice to the state "after the opening of the bids of the mistake, specifying in the notice in detail how the mistake occurred." (Gov. Code, § 14352.) Although the general contractor had notice at the time of the opening of the bids that defendant had made a mistake, the general contractor had not been told how the mistake occurred. Defendant did nothing within five days after the opening of bids to apprise the general contractor of how the mistake occurred. Even if we were to make the unjustified assumption that it was the general contractor's duty to ascertain how the mistake occurred, the general contractor would have been required to show that the mistake was not due "to carelessness in . . . reading the plans or specifications" and that the "mistake made the bid materially different than" the general contractor intended it to be. (Gov. Code, § 14352.) This showing would have been required to have been made to a court. (Gov. Code, §§ 14350, 14351.)

There is a serious question of whether the mistake of defendant was not due to carelessness in reading the plans. While the error resulted from failure to double footage figures for conduit and wire, that failure may well have resulted from failure to keep in mind that the plans, as was indicated thereon, were half scale.

There is also a serious question of whether the bid to the state was materially different from what the general contractor intended it to be. Had the next lowest electrical subcontractor's bid been used, the total bid to the state would have been increased less than one percent.

The state is not required to await the outcome of a lawsuit to execute a contract for the work on which bids are submitted. If the general contractor had refused to execute a contract, the contract probably would have been tendered to the second lowest responsible bidder. (Gov. Code, § 14332.) The general contractor's bond in the amount of $859,011.85 would have been forfeited. (Gov. Code, § 14331.)

Thus the general contractor by "winning" the lawsuit to be relieved of its bid would not only lose the possibility of making a substantial profit from the contract, but would also incur costs and attorney fees in accomplishing this result. By losing the lawsuit, the general contractor would

suffer two additional losses, i.e., payment of attorney fees to the state and forfeiture of $859,011.85.

We are unwilling to say under the circumstances of this case that the general contractor had any obligation to seek to be relieved of its bid to the state.

### 3. *General contractor's promptness in accepting defendant's offer.*

*Drennan* v. *Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757] establishes that where, as here, a subcontractor's bid becomes irrevocable because of a general contractor's reliance upon it (and upon an implied subsidiary promise not to revoke) in submitting a bid to a third person, the "general contractor is not free to delay acceptance [of the subcontractor's bid] after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." ■ Although the general contractor is not required to accept the subcontractor's bid, he must act promptly in exercising his "opportunity to accept [the subcontractor's] bid after the general contract has been awarded to him."

On August 10, 1964, the general contractor inquired of defendant whether it would honor its quotation and perform the electrical work. Defendant said it would not. ■ Defendant now claims that there is no substantial evidence to support the finding of the trial court that the general contractor made oral requests and demands upon defendant to perform the electrical work on the project in accordance with the defendant's bid. There is no merit to this contention. Acceptance of an offer need not be made by any particular words. The general contractor's communication to defendant must be viewed in the light of the fact that the defendant had previously expressed itself as being unwilling to stand by its bid. If there was any doubt about the fact that the general contractor's communication was an acceptance of defendant's bid, it was removed when the general contractor said that it would "go to law over this" if defendant refused to perform. Defendant could have understood only that the general contractor was accepting defendant's bid.

Defendant claims that the general contractor's offer to pay defendant an additional $18,000 if it would perform the electrical work is evidence that the defendant was not then obligated to perform the work for the price bid. We do not so view the matter. Defendant was then claiming that there was no offer for the general contractor to accept because defendant had withdrawn its bid before 2 p.m., July 9, 1964, while the

general contractor was obviously claiming that the withdrawal was ineffective. The general contractor knew that the next lowest bid was $48,414 higher than defendant's bid and that it was likely (as proved to be the case) that getting another subcontractor to do the job would cost more than $18,000. The offer to pay an additional $18,000 was understandable as an attempt to settle the dispute and avoid the contemplated lawsuit.[2]

■ Defendant also claims that the general contractor's attempted acceptance on August 10, 1964, came much too late. Defendant points out that in *Drennan* the bids were opened July 28, 1955, and on July 29, 1955, the general contractor accepted the subcontractor's offer. Here the bids were opened July 9, 1964, and the attempted acceptance of defendant's bid did not occur until August 10, 1964. This raises the question of when a contract is to be considered "awarded."

Section 14330 of the Government Code provides in part: "On the day named in the public notice the department shall publicly open the sealed bids and award the contracts to the lowest responsible bidders." Since this provision does not disclose of what an "award" consists, we must look elsewhere for the meaning of the word. Section 14370 of the Government Code provides in part: "Every contract awarded under this chapter shall be submitted to the Attorney General or the attorney appointed according to law and authorized to represent the department under which it is to be performed. Such a contract is not binding on the State until the appropriate attorney finds it to be in accordance with the requirements of this chapter, and endorses such finding thereon." This provision, referring to a written contract as being what is to be approved, necessarily presupposes a document signed by both parties, and it implies that the actual execution of the document is what constitutes the "award." But other statutory provisions indicate that execution of the written contract by both parties does not constitute the award. Thus section 14332 of the Government Code provides in part: "If the director deems it is for the best interests of the State, he may, on the refusal or failure of the successful bidder to execute the contract, award it to the second lowest responsible bidder." ■ This provision indicates that it is the tender of the written contract by the state to the successful bidder for execution which constitutes the "award." We think that this latter definition of "award" is what the Legislature intended.

---

[2] Of course if there had been an offer to enter into a contract for a lesser sum, that offer would have amounted to a counteroffer and its effect would have been to terminate the general contractor's power to accept the original bid. (See *Drennan* v. *Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757].) The difference between that situation and the one at bench is too clear to require discussion.

When bids are opened and read in public, the mere fact that a particular person has made the lowest bid does not mean that he has been awarded the contract. A contract may be awarded only to the lowest "responsible" bidder. (Gov. Code, § 14330.) The word "responsible" is a word of art. (*Hodgeman* v. *City of San Diego* (1942) 53 Cal.App.2d 610 [128 P.2d 412].) But even the lowest responsible bidder is not necessarily the successful bidder because all bids may be rejected if "acceptance of the lowest responsible bid or bids is not for the best interests of the State." (Gov. Code, § 14335.) Thus until the bids have been analyzed and the requisite discretion exercised, the state cannot award the contract. The consequence is that a contract is seldom, if ever, awarded on the day that bids are opened as section 14330 of the Government Code seems to require.

Here the contract was awarded July 27, 1964.[3] But the contract on that date was illusory in the sense that it was not binding on the state until August 10, 1964, when it was approved by the Attorney General. (Gov. Code, § 14370.) While it is true that in *Drennan* the court indicated that the general contractor must act promptly to accept the subcontractor's bid "after the general contract has been awarded to" the general contractor, it does not appear that the contract in *Drennan* was subject to the contingency of approval by the Attorney General or anyone else. Moreover, no problem of unreasonable delay was involved in *Drennan* because the general contractor acted before he was awarded the contract, i.e., while he "was being awarded the job."

It is unnecessary, however, for us to determine whether it was unreasonable for the general contractor in the case at bench to wait until it had a contract binding on the state before accepting defendant's offer. This is because the only testimony in the case (as opposed to the document mentioned in footnote 3 which seems to have revealed the true situation and which was tendered after the trial as an exhibit to defendant's objections to the proposed findings of fact) was that the contract was awarded on August 10, 1964. The case was tried on that theory by both sides. In the course of arguing a motion, defendant's counsel stated: "It has been stipulated and agreed that the bid date was July 9, 1964, and that the contract was awarded and entered into on August 10, 1964." Lack of promptness cannot be found where the general contractor accepted defendant's bid August 10, 1964.

---

[3]The printed notice of award published by the State Department of Public Works so states. Whether or not the notice used the term as we have indicated the Legislature intended it to be used is not clear.

### 4. *Lack of agreement on content of the subcontract.*

It is undisputed that the customary practice in the construction industry is for the general contractor who is awarded a contract to enter into a written contract with the subcontractor, which written contract embraces far more than the price which the subcontractor has bid by telephone. The additional matters would include such things as whether the subcontractor would furnish a bond, who would provide for insurance, how payments would be made and many other matters. Although the provisions other than price are not identical in all subcontracts generally or in electrical subcontracts particularly, price is the principal item as is evident from the fact (as shown by the evidence) that seldom does a general contractor fail to reach an agreement with the subcontractor whose bid is low. ▮ Defendant asserts that it should not be held to its bid price because the general contractor could not have known that the general contractor and defendant would have reached an agreement on the terms of the subcontract.

While a prospective subcontractor could submit a bid by way of a written proposed subcontract including not only the price but all other details, we are not aware that this is ever done. The customary bid is made, as it was here, by a brief telephone call in which only the price is stated. If defendant's position is correct, there would never be an occasion to invoke section 90 of the Restatement of Contracts by a general contractor against a prospective subcontractor.[4] Even a subcontractor who did not make a mistake in his bid price but who desired to avoid doing the work because of increased costs, other commitments or any other reason could claim that his bid is not binding because it is incomplete. But California has not taken that position. In *Drennan* the bid was one of price only and it is obvious that the general contractor would have entered into a written subcontract with the prospective subcontractor containing terms other than price. The Supreme Court nevertheless held that the subcontractor's bid was binding. The same rule must be applied here.

It should be noted that here the lack of an electrical subcontract between the general contractor and defendant was not due to the failure of the parties negotiating in good faith to arrive at the terms other than price. We do not intimate what our conclusion would be had that been the case. Here, as in *Drennan,* the parties did not get around to discussing contract

---

[4]See *Norcross* v. *Winters* (1962) 209 Cal.App.2d 207 [25 Cal.Rptr. 821]. There an analogous argument (to the effect that since the plaintiff general contractor submitted a written subcontract to the defendant subcontractor for his signature and since the subcontractor failed to execute the written contract, the relationship between the parties was merely one of mutual intent to enter into a written contract) was rejected on identical grounds.

provisions because defendant made it clear that it would not do the work at the price bid regardless of the other contractual provisions.

### Avoidance of Injustice

Defendant's bid is binding if injustice can be avoided only by the enforcement of the bid. In *Drennan* the injustice was the fact that the general contractor was required to pay a greater amount of money to have the work done than he would have paid if the prospective subcontractor had honored his bid. ■■■ The same situation prevails here where the general contractor paid $40,871 more than it would have paid had defendant honored its bid.

Defendant claims that the general contractor here was not done any injustice because it "saved" more than $40,871 by what is described by defendant as bid shopping in violation of public policy. Unquestionably the general contractor increased its profit by bid shopping. Although bid shopping is condemned by the "Subletting and Subcontracting Fair Practices Act" (Gov. Code, § 4100 et seq.), that act "does not apply to contracts for the construction, improvement or repair of streets or highways, including bridges." (Gov. Code, § 4100.5.) The only logical conclusion which can be drawn is that bid shopping is not against public policy when done by a general contractor awarded a contract for the construction of a freeway.[5] In this respect the situation is similar to many which are found in the law. It is illegal (and presumably against public policy) to make a wager on a horse race with a bookmaker (Pen. Code, § 337a), but it is not illegal (and presumably not against public policy) to make a wager on a horse race at a licensed race track. (Bus. & Prof. Code, § 19594.)

We see no connection between what the general contractor was able to "save" by its bid shopping and the loss which it sustained by the failure of defendant to honor its bid. If the general contractor had been able to increase its profits by reason of a decline in wages or in prices and materials, the logic of defendant's position is that in determining whether "injustice can be avoided" the money "saved" should be offset against the increased cost due to defendant's failure to honor its bid. But if defendant is correct, there is no reason to stop there. If it is shown that the general contractor could have increased its contemplated profit by more vigorous bid shopping or by more efficient conduct of the job than was actually employed, such

---

[5]Furthermore, in light of this express statutory authorization of bid shopping in the present context, it is difficult to see how it can be argued that general equitable principles ought to be applied, as defendant seems to do in suggesting that something like the doctrine of "unclean hands" should be invoked here. (See *Lynn* v. *Duckel* (1956) 46 Cal.2d 845 [299 P.2d 236], cited by defendant in this connection.) We think that the statute controls here.

evidence would logically bear on the question of whether injustice to the general contractor could have been avoided. The trial of a lawsuit based on the failure of a prospective subcontractor to honor his bid would become hopelessly confused and unjustifiably prolonged. We therefore hold that "injustice can be avoided only by enforcement of the" bid whenever the general contractor acting in good faith is unable to do the work called for in the bid of the prospective subcontractor (or to get the work done by another subcontractor) for a price at or below the price bid by the prospective subcontractor.

 The trial court, in awarding judgment for $20,435, felt "that the equities are such that this loss of $40,871 . . . should be shared equally." We do not understand that a trial court has any discretion to apportion a loss in a specified sum on the basis of "equities." *Drennan* adopts section 90 of the Restatement of Contracts which provides that under certain conditions a "promise [without consideration] is binding." Defendant's promise here was to keep open an offer to do the job for $219,129. All of the conditions were present to make that promise binding. Since the general contractor could not get the work done for less than $40,871 more than defendant's bid, the trial court's judgment did not recognize as irrevocable the offer as made, but rather an offer which was not made, namely, to do the work for $237,564. This was error. Defendant's offer as made was binding and this compelled a judgment in favor of the general contractor for $40,871.

Defendant in 150 pages of briefs makes numerous other contentions which we have carefully examined. None is meritorious and we choose not to further extend this opinion by discussing any of them.

The judgment is modified to substitute the figure $40,871 for the figure $20,435 and as so modified is affirmed. The general contractor is to recover its costs on appeal from the defendant.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied March 8, 1971, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied April 8, 1971.