HOEL–STEFFEN CONSTRUCTION
COMPANY

v.

The UNITED STATES.

No. 541–78.

United States Court of Claims.

June 30, 1982.

Robert D. Marshall, Atlanta, Ga., attorney of record, for plaintiff. Curtis W. Martin and Griffin, Cochrane & Marshall, Atlanta, Ga., of counsel.

Cynthia C. Cummings, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before NICHOLS, BENNETT and SMITH, Judges.

## OPINION *

NICHOLS, Judge:

This government contract case presents two issues for resolution. First, whether a contracting officer's (CO) refusal to substitute subcontractors is arbitrary and capricious. Second, whether a contract provision which relieves the government of liability for a CO's refusal to substitute subcontractors can preclude recovery where the CO's refusal to substitute is plainly wrong. We hold that, in the instant case, the CO's refusal to substitute was, in fact, arbitrary and capricious, or so grossly erroneous as to imply bad faith. We further hold that the

exculpatory clause does not preclude recovery where the CO's actions were of that character.

## I

In the summer of 1978, the General Services Administration (GSA) issued an invitation for bids for the construction of a project to be built in St. Louis, Missouri. Bids were scheduled to be opened at 3:00 p.m. on July 27, 1978. In order to prepare and submit a bid on the project, plaintiff, Hoel-Steffen Construction Company (Hoel-Steffen), solicited subcontractor bids for the mechanical portion of the project from Rock Hill Mechanical Corporation (Rock Hill) and Condaire, Inc. (Condaire). Unbeknownst to its subcontractors, plaintiff established a "freeze point" of 2:00 p.m. on July 27 as the time beyond which it would no longer receive any further subcontract bids. In establishing a 2:00 p.m. "freeze point," plaintiff had one hour in which to firm up its own bid price before the scheduled bid opening time of 3:00 p.m.

Rock Hill submitted its scope sheet and bid price to plaintiff before the established 2:00 p.m. "freeze point." Rock Hill's total bid price was $3,254,020. Condaire submitted a scope sheet to plaintiff but chose not to submit a bid price.

From 2:24 p.m. to 2:52 p.m., Mr. Robert Hoel, plaintiff's president, relayed its bid by telephone to plaintiff's representative in Kansas City, the location of the bid opening. While Mr. Hoel was relaying the bid to plaintiff's representative, Rock Hill requested Mr. Hoel's assistant to raise its bid price by $200,000. No reason for this request was given. Rock Hill's request was conveyed to Mr. Hoel but it was too late to incorporate the change in price into the bid. Plaintiff's bid was submitted to GSA in Kansas City at 2:59 p.m. on July 27, 1978.

As low bidder, plaintiff was awarded the contract. Rock Hill refused to perform the work reflected in its scope sheet for the

---

* Part II of this opinion incorporates with some modification the opinion of Trial Judge Merow. We disagree with the trial judge's conclusion in part III and have substituted our own discussion. We adopt the trial judge's findings of fact, but do not reprint them because the pertinent facts are adequately set forth in this opinion.

original bid price of $3,254,020. Rock Hill explained that the original bid price reflected an error in calculation. Rock Hill further justified its refusal to perform at its original bid price on the ground that the higher quotation had been made to Edgemont Construction Company (Edgemont) who had been the second low bidder on the project.

On September 25, 1978, plaintiff requested Mr. Robert Flack, the project's CO, to substitute Condaire for Rock Hill, pursuant to paragraph 17.10 of the subcontractor listing clause of the contract. Plaintiff had negotiated with Condaire after award of contract had been made. Condaire had agreed to do the work for $46,000 more than Rock Hill's original bid. Plaintiff informed Mr. Flack that if Condaire was substituted for Rock Hill, Plaintiff would absorb the $46,000 loss. On October 2, 1978, Mr. Flack denied plaintiff's requested substitution on the ground that it was not an "unusual situation" within the meaning of paragraph 17.10.

Plaintiff was forced to employ Rock Hill's services at the higher bid. Plaintiff now seeks to recover, under a breach of contract theory, the difference between Rock Hill's high bid and Condaire's bid.

■ The trial judge determined that the CO's decision to refuse plaintiff's request for substitution was arbitrary and capricious but that the exculpatory language contained in paragraph 17.13 precluded plaintiff's recovery. We agree with the trial judge's conclusion that the CO's refusal to substitute subcontractors was arbitrary and capricious. We do not agree, however, that paragraph 17.13 precludes plaintiff's recovery. Accordingly, we affirm the trial judge's opinion in part and reverse in part.

## II

■ The contractor must list its subcontractors and may make a change only with the CO's consent in accordance with paragraph 17.10 of the subcontractor's listing clause which states:

17.10 No substitutions for the individuals or firms named will be permitted except in unusual situations and then only upon the submission in writing to the Contracting Officer of a complete justification therefor and receipt of the Contracting Officer's written approval. The Contractor shall not be entitled to any increase in the contract price if substitution is authorized. However, the contract price shall be reduced if the Contractor's cost of performing the work is decreased as a result of approval of the subcontractor's substitution. In the event the Contracting Officer finds that substitution is not justified, the Contractor's failure or refusal to proceed with the work by or through the named subcontractor shall be grounds for termination of the contract under the provisions of Clause 5 of the General Provisions.

As paragraph 17.10 states, a CO will allow a contractor to substitute subcontractors after award of the prime contract only after the request has been submitted to the contracting officer in writing and the contracting officer has approved the substitution, by finding that an unusual situation exists which justifies the substitution. The term "unusual situations," as used in paragraph 17.10, is defined in the General Services Administration Procurement Regulation (GSPR), 41 C.F.R. § 5B–2.202–71 (1976). GSPR 5B–2.202–71 defines "unusual situations" as:

(1) Death or physical disability, if the named subcontractor is an individual;

(2) Dissolution, if a corporation or partnership;

(3) Bankruptcy;

(4) Inability to furnish a reasonable performance and payment bond;

(5) Inability to obtain, or loss of, a license necessary for the performance of the particular category of work;

(6) Failure or inability to comply with a requirement of law applicable to contractors, subcontractors, or construction, alteration, or repair projects;

(7) Failure or refusal to execute the subcontract in accordance with the terms

of an offer submitted to the contractor or bidder prior to the latter's submission of his bid, but only where the contracting officer can ascertain with reasonable certainty the terms of such offer. In the absence of any other factors, such a failure or refusal will be considered an unusual situation only if the bidder obtained, prior to bidding, an enforceable commitment from the subcontractor involved;

(8) Failure to meet any criteria of responsibility set out in Subpart 1–1.12, but only when the contracting officer, in the exercise of sound discretion, finds that substitution for this cause would be in the best interests of the Government (i.e., that it would not be prejudicial to the rights of other bidders and that the contractor or bidder has not attempted to circumvent the restraint on bid shopping by listing a nonresponsible subcontractor in order to gain an opportunity to bid shop prior to making the requested substitution); or

(9) Failure to meet the qualifications requirements of an applicable Specialist or Competency of Bidder clause, but only when the contracting officer, in the exercise of sound discretion, after discussion with the contractor or bidder and, if appropriate, the named subcontractor, finds that substitution for this cause would be in the best interests of the Government as specified in [5B–2.202–71(a)(8) above.]

The list of examples, however, is not intended to be exhaustive, as evidenced by the introduction of the regulation, which begins:

The term "unusual situations" includes (*but is not limited to*) a subcontractor's: * * * [Emphasis supplied.]

In considering Hoel-Steffen's request for substitution of subcontractors within the context of an "unusual situation" as discussed in paragraph 17.10 and defined in GSPR § 5B–2.202–71, Mr. Flack believed Hoel-Steffen's situation closely followed example (a)(7) of the regulation, except that Rock Hill's bid prices had been submitted *orally* (by telephone), a fact Mr. Flack con-

sidered was critical in passing on the request. Mr. Flack believed an *oral* quotation from a subcontractor was not an enforceable commitment.

On the basis of this understanding of the applicable regulation, Mr. Flack chose not to exercise his authority under paragraph 17.12 of the subcontractor listing clause and did not request any information from any party relevant to Hoel-Steffen's request. He did consider, however, the allegations made by Edgemont, the second low bidder on the project, which accused plaintiff of engaging in bid shopping for the mechanical work for the project. Mr. Flack viewed Condaire's quotation of $3,300,000 as a "better price" than Rock Hill's amended price of $3,454,020 and concluded plaintiff had engaged in bid shopping as he understood it.

The basis for the contracting officer's decision not to permit plaintiff to substitute subcontractors can be traced to his adamant belief that it was virtually impossible to verify the terms and existence of a subcontractor's oral quotation to a general contractor if transmitted via telephone. The only manner in which the contracting officer believed an oral quotation could be proven was by the corroborative testimony of three to five independent witnesses. A witness, however, in the contracting officer's opinion, was incompetent to testify if he or she had been a party to the conversation in question, or had been listening in on the telephone, unannounced, as the quotation was given.

Therefore, despite the contracting officer's belief that Hoel-Steffen's situation "was within the scope of GSPR § 5B–2.202–71 meaning of the term 'unusual situation'" with "the thrust of it go[ing] to paragraph (a)(7)," he denied plaintiff's request. His reason for denying plaintiff's request was his inability to ascertain the terms and conditions of the agreement which he believed paragraph (a)(7) required, because Rock Hill's quote and modification were transmitted to plaintiff by telephone. The contracting officer offered no explanation why he refused to exercise his discretion and allow the substitution simply on

the basis that it was an "unusual situation" as defined by the applicable GSA application. Although he was aware the regulation did not prevent him from allowing a substitution of subcontractors outside the nine situations stated, he admitted having had no occasion to exercise his discretion in such a situation. More importantly, perhaps, the contracting officer denied plaintiff's request because he believed Hoel-Steffen had engaged in bid shopping. This conclusion, however, ignores several important factors.

The contracting officer was fully aware that the price quoted to Hoel-Steffen by Condaire, Inc., the subcontractor proposed for substitution of Rock Hill, was $3,300,-000. He also realized:

> [t]hat [$3,254,020] is the price that [plaintiff] used to bid the government and * * that that is the number that is written down on the worksheets and appears to be authentic when you evaluate the total worksheets and compare them to the total amount bid.

Moreover, he understood the term "bid shopping" to refer to prime contractors' attempts to increase profit or to cut costs by getting a lower bid from a subcontractor after award of the contract than the bid relied upon in submitting their own bid to the government. Yet despite the fact that Condaire's quotation was admittedly higher than the price Hoel-Steffen utilized in its bids to GSA, the contracting officer believed plaintiff was guilty of bid shopping. His basis for this conclusion was twofold. First, Hoel-Steffen had negotiated after award with a subcontractor who had not submitted a bid for the job before award. Second, he felt unable to determine whether Condaire's price was higher or lower than that of the named subcontractor since its bid was submitted orally and hence was unascertainable.

Yet the most difficult of all the contracting officer's opinions to understand was his belief that, under the circumstances, he had no discretion to exercise the investigative powers bestowed upon him by the subcontractor listing clause. Paragraph 17.12 of the clause states (in part):

The Contracting Officer shall have the right to require any information and supporting evidence he may deem relevant and necessary in connection with the approval or disapproval of a request for substitution * * *, including but not limited to, certified copies of the original worksheets used in the preparation of the bid on the prime contract, certified copies of the offers submitted to the successful bidder by the named subcontractor and the proposed substitute, and affidavits as to the circumstances relating to the request for substitution or the estimated cost of performance by any subcontractor named or proposed as a substitute.

The contracting officer testified clearly at trial that he was aware of the provisions of paragraph 17.12. He also testified that, although he had received from plaintiff numerous submissions including the original worksheets and affidavits, he did not seek further information from any interested party. He did not inquire of Rock Hill what its original quotation had been or for what reason it had been made, despite Rock Hill's offer, by its attorney, to provide whatever information the contracting officer might require. When Mr. Flack was asked at trial why he did not implement the provision of the clause which gave him the authority to request whatever information was needed, he responded.

> Well, the written submission [by plaintiff] stated that the subcontractor's bid was by telephone. Therefore, I was aware that there was no evidence that I as a contracting officer could reasonably evaluate.

■ The preliminary issue, then, is whether the basis for the contracting officer's decision was arbitrary and capricious, or so grossly erroneous as necessarily to imply bad faith. The court's role is not to determine the "proper administration and application of the procurement regulations," rather "[t]he court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis." *Continental Busi-*

*ness Enterprises, Inc. v. United States*, 196 Ct.Cl. 627, 638, 452 F.2d 1016, 1021 (1971), citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). The "reasonable basis" test for measuring the validity of a contracting officer's decision has received long standing recognition by this court. *See Keco Industries, Inc. v. United States*, (Keco II), 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1204 (1974). The high burden of proof required to establish there was no reasonable basis for the decision, however, is the plaintiff's to carry. *Keco Industries, Inc. v. United States*, (Keco I), 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970).

The subcontractor practice of telephoning bid prices to general contractors on the bid opening day was established by the record in this case to be the recognized custom and practice of the construction industry in the St. Louis area. Moreover, the construction industry as a whole has accepted the custom and practice of binding a subcontractor to a quotation utilized by a prime contractor in his bid, regardless of the manner in which it was transmitted, since the California Supreme Court decided *Drennan v. Star Paving Co.*, 51 Cal.2d 409, 333 P.2d 757 (1958). In *Drennan*, the prime contractor had relied upon the bid of Star Paving Company in calculating his own bid for the "Monte Vista School Job." Drennan also had to comply with a subcontractor listing clause in his bid and the subcontractor involved had telephoned its bid to Drennan on the bid opening date. Drennan's bid was low and, after he had been awarded the contract, the subcontractor refused to perform, alleging it had discovered an error in its bid. Justice Traynor analogized the situation to an offer for a unilateral contract which the offeror attempts to withdraw after the offeree has begun performance, but before performance is complete. *Id.* at 414, 333 P.2d at 758–59. The court considered the injury a general contractor was likely to incur if, after relying upon a subcontractor's bid in its own submission, the subcontractor was free to withdraw its bid before acceptance, and found an implied subsidiary promise in the subcontractor's bid not to revoke for a reasonable time. This reasoning allows a general contractor to utilize the doctrine of promissory estoppel to bind a subcontractor to its original bid if the contractor's reliance upon that bid was justifiable. Reliance was justifiable if the contractor had informed the subcontractor promptly that its bid had been utilized. *Id.* at 415, 333 P.2d at 760. In the case in issue, plaintiff's submissions clearly indicate plaintiff informed Rock Hill that its bid was being used by plaintiff before Rock Hill requested its bid be raised. If the contracting officer doubted the veracity of this statement, he could have questioned Rock Hill regarding the sequence of events pursuant to his authority under paragraph 17.12 of the clause.

After the *Drennan* decision was announced, the drafters of the *Restatement (Second) of Contracts* created section 87(2) to deal specifically with the *Drennan* situation and other similar circumstances in which detrimental reliance is reasonably foreseeable prior to formal acceptance of the offer. Thereafter, most courts faced with a recalcitrant subcontractor reneging on its bid price to the general contractor have followed *Drennan's* lead and applied the doctrine of promissory estoppel to the facts of each case. *See* cases cited in Magee, *Contracts—Promissory Estoppel and the U.C.C. Statute of Frauds*, 48 Miss.L.J. 883, 888, n. 41 (1977). *See also* Closen and Weiland, *The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and Other Theories to the Relations Between General Contractors and Subcontractors*, 13 John Mar.L. Rev. 565 (1979–80). Both *Saliba-Kringlen Corp. v. Allen Engineering Co.*, 15 Cal. App.3d 95, 92 Cal.Rptr. 799 (1971) and *Debron Corp. v. National Homes Construction Corp.*, 493 F.2d 352 (8th Cir. 1974), cases discussed by both parties, are part of the *Drennan, supra,* following.

On the basis of the foregoing discussion, it appears that a subcontractor's quotation to a general contractor can form the basis of an enforceable commitment between the parties even prior to formal acceptance by the contractor. The construction industry had recognized this concept for over 20

years preceding the signing of the contract in issue.

Nor does the fact that the quotation was submitted by telephone alter the enforceable nature of the commitment between subcontractor and general contractor. In *Drennan v. Star Paving Co., supra,* 51 Cal.2d at 411, 333 P.2d at 758, the court especially noted that testimony was ·heard which established that "it was customary in that area for general contractors to receive the bids of subcontractors by telephone on the day set for bidding." Since *Drennan, supra,* numerous courts faced with a subcontractor's refusal to perform in compliance with its initial quotation have taken judicial notice of the fact that subcontractors frequently telephone their bids to the general contractor for consideration in the eleventh hour of the bidding process. *Saliba-Kringlen Corp. v. Allen Engineering Co.,* 15 Cal.App.3d 95, 100–101, 92 Cal.Rptr. 799, 801 (1971); *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 115–16, 190 N.W.2d 71, 73 (1971) ("subcontractors and contractors customarily negotiate on the telephone in submitting their bids"). Others simply have noted the subcontractor's bid was submitted by telephone without taking issue with the practice. *Montgomery Industries International, Inc. v. Thomas Construction Co.,* 620 F.2d 91, 93 (5th Cir. 1980); *Janke Construction Co. · v. Vulcan Materials Co.,* 527 F.2d 772, 776 (7th Cir. 1976); *Debron Corp. v. National Homes Construction Corp.,* 493 F.2d 352, 354 (8th Cir. 1974); *Robert Gordon, Inc. v. Ingersoll-Rand Co.,* 117 F.2d 654, 655 (7th Cir. 1941). *See also* Closen and Weiland, *The Construction Industry Bidding Cases, supra,* 13 John Mar.L.Rev. at 574; Keyes, *Consideration Reconsidered—The Problem of the Withdrawn Bid,* 10 Stan.L.Rev. 441, 461 (1957–58); *Bidding & Bonds, Subcontracting and Labor,* Conference Briefs from the 1981 Construction Contractor Conference (Federal Publications, Inc.) at page 1. And, at least one court has overruled a subcontractor's demurrer which had alleged "a telephoned quotation is insufficient as a promise or offer which could reasonably induce action." *C. E. Frazier Construction Co. v. Campbell Roofing and Metal Works, Inc.,* 373 So.2d 1036, 1038 (Miss.1979). The rationale underlying this subcontractor practice explains somewhat the necessity for such last minute performance. Subcontractors regularly call in their prices as late as possible in an effort to prevent general contractors from utilizing them to extract an even lower price from the competition. *Saliba-Kringlen, supra,* 15 Cal.App.3d at 100, 92 Cal.Rptr. at 801.

Both the rationale and the practice are tacitly recognized by the subcontractor listing clause incorporated in the contract at issue. Paragraph 17.15, the purported purpose of which is "to assure the timely receipt of accurate bids," strongly recommends a contractor "urge" all interested subcontractors to submit a written proposal outlining the work their bids are intended to cover, including any intended deviation from the contract's specifications at least 48 hours prior to the bid opening. It is significant to note, however, that the clause does not require a subcontractor to include its price in its written proposal. Paragraph 17.15, by its language, contemplates and condones the transmittal of the subcontractor's bid price sometime during the 48 hours remaining before bid opening. On this basis it is logical to conclude that the drafters of paragraph 17.15 anticipated that the last minute price submission would be made, in accordance with the custom and practice of the industry, by telephone.

■ Accordingly, the basis upon which the contracting officer acted in denying a substitution in this matter is contrary to case law, industry custom and practice, and the intent of paragraph 17.15 of the subcontractors listing clause itself. The proposition that oral subcontractor quotes are unsusceptible to proof and unenforceable seems wholly unreasonable. Therefore, to the extent the contracting officer denied plaintiff's request for substitution of subcontractors, after determining its predicament fell within the purview of GSPR § 5B–2.202–71's "unusual situation," solely because Rock Hill's quotations were made by telephone, then such a determination is arbitrary and capricious.

■ Likewise if the contracting officer accepted as true the fact that Condaire's price was higher than the price relied upon by plaintiff in its bid to GSA and yet denied plaintiff's request for substitution because he felt unable to verify the figure used by plaintiff as the initial quotation Rock Hill made by telephone, then his decision was unreasonable. To conclude otherwise would be to sanction a result contrary to the intent of the regulation. The principal objective of both the clause and the regulation, as recognized by GSA, is to prevent bid shopping and thereby to afford some protection for subcontractors. B–158227, 45 Comp.Gen. 829, 834, 835 (1966). That goal is met where the contractor's original worksheets illustrate that the proposed substitution will not result in a windfall, but will, in fact, force it to incur a financial disadvantage. *Id.* The subcontractor listing clause affords subcontractors listed "some guarantee of receiving the contract;" the protection, however, is not absolute. Here, the evidence established plaintiff had not engaged in bid shopping for financial advantage, and the denial of a requested substitution under these circumstances must be considered arbitrary and capricious. *See Meva Corp. v. United States*, 206 Ct.Cl. 203, 511 F.2d 548 (1975).

■ Moreover, to the extent the contracting officer failed to exercise his discretion to verify and determine if an "unusual situation" was present, this failure also renders the decision arbitrary and capricious. *Schlesinger v. United States*, 182 Ct.Cl. 571, 583–84, 390 F.2d 702, 709 (1968); *see also New York Shipbuilding Corp. v. United States*, 180 Ct.Cl. 446, 460–62, 385 F.2d 427, 436–37 (1967).

### III

The question now is what legal effect is to be given to a contracting officer's decision that is, to say no more about it, arbitrary and capricious. Defendant relies on paragraph 17.13, a contract clause, to give it the same effect as if it were sound and reasonable. The clause reads as follows:

Nothing contained in this clause shall in itself be construed to create any contract or property rights in the successful bidder or any subcontractor. The imposition of any requirements under subparagraph (17.11) of this clause or *the Contracting Officer's refusal to approve a substitution pursuant to the provisions of subparagraphs (17.10) and (17.12) of this clause shall not give rise to any clause [sic] of action against the Government by the successful bidder* or by any subcontractor engaged or proposed to be engaged by the successful bidder. [Emphasis supplied.]

The most obvious comment on this clause is that, as construed by defendant, it is contrary to the Wunderlich Act, 41 U.S.C. § 321. That Act provides that no contract provision giving finality to a decision of the head of an agency or his authorized representative in a contract dispute shall be pleaded as limiting review to issues of fraud. It goes on—

* * * *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

■ Congress wrote this language to overrule a decision of the Supreme Court, *United States v. Wunderlich*, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951), which held that a provision for finality of a contracting officer's decision made it final even as to questions of law; the only exception allowed by the finality clause was an instance of actual fraud. This court had held, 117 Ct.Cl. 92 (1950), that the administrative decision involved was so grossly erroneous as to imply bad faith. This plainly meant that bad faith was to be inferred from the grossness of the error. We had long held that finality clauses were subject to this limitation, *e.g., Levering & Garrigues Co. v. United States*, 71 Ct.Cl. 739 (1931). The Supreme Court held that such gross error does not, without more, constitute the kind of fraud that provided the only exception it would allow this court to read into finality.

The legislative history, H.R.Rep.No.1380, 83d Cong.2d Sess. 2, *reprinted in* 1954 U.S. Code Cong. & Ad.News 2191, states expressly that the purpose of what always has been called the Wunderlich Act is to "overcome the effect" of the Wunderlich decision. The majority decision is quoted with disapproval and the dissents with approval. We consider, therefore, that the pre-Wunderlich case law applying the "so grossly erroneous as necessarily to imply bad faith" standard is reinstated and is good law today. The Contract Disputes Act of 1978, 41 U.S.C. § 609(b) (Supp. II 1978), also repeats and again reinstates that standard.

We have recently had occasion to consider the question of bad faith in contract administration. *Haney v. United States*, 676 F.2d 584 (1982). We there point out that where no contract finality is claimed, bad faith is rejected as a ground of decision except in compelling cases such as those where a specific intent to injure the plaintiff is shown. (At 586.) On the other hand, the implication of bad faith "from an error of sufficient grossness" we said "is inseparable from use by defendant of clauses for finality of administrative decisions." (At 587.) In *Haney* the actions assailed were not claimed to be entitled to contract finality; therefore, we applied a strict standard of proof of bad faith, which plaintiff failed to meet. Here we have the other side of the coin.

The standard also has its place in the history of our pay cases. *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954) is still constantly quoted, *e.g.*, in *Haney, supra*, for its reference to the presumption of good faith of administrative officials and that a finding of bad faith requires "well-nigh irrefragible proof." Few, having verified that quote, read further to find out what proof was "irrefragible." One who does will discover that finality was claimed for an adverse action against Mrs. Knotts, if procedures were as prescribed by statute, and that the standard of review was "so grossly erroneous as to imply bad faith." The inference of bad faith was drawn although the "irrefragible proof" was wholly inferential and circum-

stantial. No one was found to admit he acted in bad faith.

█ Questions that arise when a statute undertakes to confer finality on an administrative decision do not arise where the finality is wholly the creation of a contract clause. In the former class of case questions as to the reality of consent by Congress to the suit must inevitably arise. *Cf. United States v. Erika*, —— U.S. ——, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). In the latter case they do not. Instead we have in the history of the Wunderlich Act a strong expression of repugnance by Congress to the creation of decisional finality by contract clause, and a desire to confine the practice within reasonable limits and to retain for the judiciary their proper functions.

Also, it is not a question of limiting liability by contract clause, as in *Wells Bros. Co. v. United States*, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148 (1920) (clause allowed suspension but allowed extension of time only, no delay damages); *Freedman v. United States*, 162 Ct.Cl. 390, 320 F.2d 359 (1963). In *Ozark Dam Constructors v. United States*, 130 Ct.Cl. 354, 127 F.Supp. 187 (1955), the government agreed to furnish cement to a dam construction project as government-furnished material, but stipulated it would not be liable for delay in cement delivery. This court held the clause was valid but construed it not to provide against liability in the event, which occurred, of the government negligently failing to arrange for alternative means of delivery in case of a railroad strike.

The trial judge identified this case as belonging in the *Wells, Freedman*, and *Ozark* group, as a limitation of liability in certain contingencies, such as delays in delivery of government-furnished material. But it is apparent the clause we have before us was not intended to work in that manner. Should it have said the government would allow a substitution of subcontractors when Hell froze over, that would be one thing. Then the only proper subject of judicial inquiry would be the temperature of Hell. But it did not say this. On some

occasions it allowed the substitution of contractors, *i.e.*, when the contracting officer graciously acquiesced, and then the creation of new contract or property rights occurred without any restriction by paragraph 17.13. On other occasions, this effect did not occur, and what was the difference between the first and second class of occasions? One thing only: the fiat of the contracting officer one way or another. If this is not an attempted decisional finality contrary to the Wunderlich Act, what type of clause could be?

Even as a clause limiting liability on the occurrence of contingencies, paragraph 17.-13 would be subject to strict construction under authority of the *Ozark* case. By such strict construction, it seems apparent that the contracting officer's decision here under consideration was not rendered "pursuant to" the contract clauses written to govern the situation. They were rendered in contravention to these clauses.

 Accordingly, we conclude that paragraph 17.13 is an attempt to accord finality to an administrative decision whether or not based on errors of law. So construed it is contrary to the Wunderlich Act unless the Wunderlich Act exceptions are read into it. The appropriate exception to apply here is the exception for decisions "so grossly erroneous as necessarily to imply bad faith." The administrative decision here fits into this language as into a glove and, therefore, it is not exempt from judicial review. The conclusions we derive from such review are stated in part II of this opinion.

IV

██ Upon the findings and foregoing opinion, the court concludes as a matter of law that plaintiff is entitled to recover for the government's arbitrary and capricious refusal to substitute subcontractors, a decision which is so grossly erroneous as necessarily to imply bad faith. The case is remanded to the trial division for computation of damages under Rule 131(c).