Filed 6/21/16; pub order 7/19/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FLINTCO PACIFIC, INC., | B258353 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. YC067984) |
| v. | |
| TEC MANAGEMENT CONSULTANTS, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stuart M. Rice, Judge. Affirmed.

Lax & Stevens and Paul A. Lax for Plaintiff and Appellant.

Musick, Peeler & Garrett, Jack W. Fleming and Peter J. Diedrich for Defendant and Respondent.

———————————

INTRODUCTION

Defendant and subcontractor TEC Management Consultants, Inc. (TEC) submitted a written bid to plaintiff and general contractor Flintco Pacific, Inc. (Flintco) to perform glazing work for $1,272,090 on a project to construct a new building at Diablo Valley College in Pleasant Hills, California. The bid contained terms and conditions that affected the bid price. Flintco used TEC's bid price in compiling its own bid to the owner. Flintco was awarded the contract on the building project (the project) and sent TEC a letter of intent to enter into a subcontract and a standard-form subcontract, both of which documents differed materially from TEC's bid. TEC refused to enter into a subcontract. Flintco secured another subcontractor for that scope of work and sued TEC on a theory of promissory estoppel seeking the difference between TEC's bid and the amount Flintco was required to pay the replacement subcontractor. After a bench trial, the court entered judgment in favor of TEC finding that Flintco did not reasonably rely on TEC's bid price without considering the material conditions stated in TEC's bid. The court found that thereafter, the proposed subcontract Flintco sent TEC constituted a counteroffer because it contained material variations from the conditions in TEC's bid. The counteroffer gave TEC the right to withdraw its bid. In its ensuing appeal, Flintco failed to demonstrate that there was no substantial evidence to support the trial court's findings. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Flintco is a California licensed general engineering and general building contractor. It's eight nation-wide offices do approximately $1 billion a year in business. TEC is a California corporation.

On May 17, 2011, TEC submitted a bid to Flintco to perform subcontract work on the project for $1,272,960. Immediately below the bid price read: "A DEPOSIT OF 35 % IS REQUIRED FOR THIS WORK." The deposit was for security and to enable TEC to lock in a price with its suppliers. Other conditions of TEC's bid were that the bid could be withdrawn if not accepted within 15 days and that the proposed price was "subject to a minimum 3% escalation, per quarter, after 15 days acceptance period."

2

TEC was the lowest bidder for the glazing work. TEC's Chief Executive Officer, Tim Coffey, submitted the bid with the intent that TEC would be listed as the subcontractor and testified it was reasonable for Flintco to rely on TEC's bid if the bid were complete and close to the low number.

Also on May 17, 2011, Flintco submitted its written general contractor's bid to the project owner, Contra Costa Community College District. Flintco incorporated TEC's bid and listed TEC as the curtain wall and glazing subcontractor.

John Stump, Flintco's Vice President of Operations who has worked for Flintco for 13 years, is responsible for overseeing Flintco's operations. He explained that subcontractor bids are usually submitted up to the bid deadline. Typically, after Flintco is awarded the prime contract, it notifies the winning subcontractors. Most often, Flintco gives notice over the telephone. If a subcontractor needs a more formal notice, Flintco will send out a "letter of intent." Generally, Flintco then enters into what it calls the buy-out procedure, during which the project manager goes through all of the bids to determine that they correctly cover the designated scope of work. If a bid raises no question about the scope of work, the project manager will send out a subcontract. If there are questions, the manager will make a call to the winning subcontractor first.

Craig Smart, Flintco's Project Engineer, testified that, based on his experience at Flintco and elsewhere, upon receipt of the general's standard-form subcontract, the subcontractors mark it up and identify changes. This is the negotiation process. Of the 40 subcontractors on the project, Flintco reached agreement with all but TEC.

TEC had notice that it was the winning bidder by July 1, 2011, shortly after Flintco began work on the project, because on that date, Flintco met with TEC and Universal Brass, Inc. (UBI), who was to do the glazing work on the project for TEC. The purpose of the meeting was "to discuss the up coming [*sic*] project."

On July 5, 2011, Flintco sent its "letter of intent" to TEC. The letter indicated Flintco's "*intent to issue* a Subcontract Agreement to TEC" for the project. (Italics added.) The letter stated that the "*contract award is contingent upon the following terms*

3

*and conditions*," including (1) a requirement that TEC accept liquidated damages and retention provisions, and (2) agree on a complete scope of work. (Italics added.)

On July 14, 2011, Flintco's Project Manager Joshua Frantz sent Flintco's standard-form subcontract with exhibits to TEC. In Coffey's view, the subcontract Flintco sent was a sample but was incomplete because it did not name TEC, identify a scope of work, or list a price. Furthermore, "[a] lot of items that we stated in our May 17th proposal [were] in conflict with a lot of other terms" contained Flintco's standard-form subcontract. Upon receipt of the "draft contract" and letter of intent, Coffey called Frantz to explain that the parties had "some major differences that we need to discuss." Among the items they "chatted about" were that (1) TEC would not provide a bond, whereas Flintco required a bond; (2) TEC had not received a scope of work that complied with TEC's contractor's license; (3) TEC would not agree to the liquidated damages clause; and (4) Flintco's version did not acknowledge TEC's deposit requirement, "which is very critical." Coffey also noted that the 15 days TEC's offer would remain open had already lapsed, triggering TEC's escalation clause. Frantz said he would look into the bond problem because he was new to Flintco.

The next conversation between Flintco and TEC occurred a couple of weeks later, in late July 2011, but there was no progress in negotiations. Although Stump was authorized to waive many of the provisions in the Flintco subcontract that deviated from TEC's bid, he never told Coffey that he was willing to exercise that authority.

On August 23, 2011, TEC sent a letter notifying Flintco of its decision not to pursue the contract for the project. Flintco received the notice on August 29, 2011.

Meanwhile, on August 26, 2011, Flintco sent TEC a new subcontract that had not been modified to acknowledge any of the conditions contained in TEC's bid. The new contract contained no provision requiring Flintco to pay a 35 percent deposit. Frantz acknowledged that he never reviewed the conditions in TEC's bid while assisting in the preparation of a subcontract with TEC.

4

On September 8, 2011, Frantz e-mailed Coffey that Flintco "cannot relieve TEC of their obligation to perform" the work as bid. Frantz's e-mail asked TEC to sign Flintco's subcontract as issued to TEC.

On September 12, 2011, Coffey told Frantz that TEC's bid had expired. Coffey explained that TEC was exercising its right under its proposal to withdraw its bid. Frantz did not indicate that any of the terms or conditions in the Flintco subcontract were negotiable.

Flintco found a new subcontractor to do the glazing work and sued TEC for $327,050 in a single cause of action alleging promissory estoppel.

At trial to the bench, Jay Washburn, Flintco's project manager, explained that in his experience, bid day is "usually chaotic" because of the sheer volume of paperwork and so it is impossible to negotiate the terms and conditions in a subcontractor's bid that day. Conflicts between bid conditions and contracts are normally resolved and specific terms and conditions are negotiated only after the project contract is awarded. Stump, Washburn, and Frantz testified that it is standard practice for subcontractors to include an extensive number of terms and conditions in their bids. Specific terms and conditions in a subcontractor's bid are not relevant to the scope of work, are typically boilerplate and conflict with Flintco's sub- and prime- contracts. Thus on bid day, Flintco disregards all terms and conditions of a subcontractor's bid except for scope of work, price, length of time the bid would remain open, and bonding. The stated "purpose of reviewing the terms and conditions in a subcontractor's bid prior to the bid deadline is to find 'red flags.' The issue, according to Mr. Stump, is whether 'we are going to be fighting about something.' " Hence, Washburn agreed it was fair to say that an unusual term or condition might escape his attention because of the cursory nature of his review of bids on bid day.

Frantz did not look at TEC's terms until after TEC was listed in Flintco's bid. No one at Flintco discussed TEC's requirement for a 35 percent deposit on bid day. Stump may have looked at the conditions of TEC's bid before trial.

The trial court ruled in favor of TEC.  It found that Flintco did not satisfy every element of promissory estoppel because its reliance on TEC's bid price only without regard for material conditions that related directly to TEC's bid price was not reasonable.  Thereafter, in sending TEC its standard form subcontract, with terms that conflicted with TEC's bid terms, Flintco made a counter offer that gave TEC the right to withdraw its bid.  TEC's withdrawal was caused by Flintco's unwillingness to accept a number of material terms of TEC's bid.  No agreement was reached between Flintco and TEC concerning material terms.  Flintco's written communications to TEC demonstrate Flintco's " 'hard ball' tactics" or a take-it or leave-it attitude.  The communications between the two parties distinguished this case from *Drennan v. Star Paving Co.* (1958) 51 Cal.2d 409 (*Drennan*), the court ruled.  Flintco appealed.

## CONTENTIONS

Flintco contends that the trial court erred in ruling that Flintco failed to satisfy the elements of promissory estoppel.

## DISCUSSION

"A general contractor may recover damages incurred as a result of its reasonable reliance on a subcontractor's mistaken bid under the theory of promissory estoppel.  ' "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." [Citation.]  This principle is applicable to a proposed subcontractor (promisor) who makes a bid (and with it an implied subsidiary promise to keep the bid open for a reasonable time after the awarding of the general contract) to a general contractor (promisee) who in turn bids on a construction contract with a third person in reliance upon the subcontractor's bid (and subsidiary promise) and is the successful bidder.' [Citations.]" (*Diede Construction, Inc. v. Monterey Mechanical Co*. (2004)

6

125 Cal.App.4th 380, 385-386, citing *Saliba–Kringlen Corp. v. Allen Engineering Co.* (1971) 15 Cal.App.3d 95, 100 (*Saliba- Kringlen*); Rest.2d Contracts, § 90 (1981).)**[1]**

As stated in *Drennan*, *supra*, 51 Cal.2d 409, the seminal case in this area, the subcontractor's "offer constituted a promise to perform on such conditions as were stated expressly or by implication *therein* or annexed thereto by operation of law. [Citation.] [The subcontractor] had reason to expect that if its bid proved the lowest it would be used by [the general contractor]." (*Id*. at p. 413, italics added.) "Reasonable reliance serves to hold the offeror in lieu of the consideration ordinarily required to make the offer binding." (*Id*. at p. 414.)

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' [Citation.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901; *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310.) "[T]o prevail on its promissory estoppel claim, [Flintco] was required to prove that it had reasonably relied on [TEC's] bid to its detriment, and that injustice could be avoided only by enforcing [TEC's] promise to perform at the quoted price." (*Diede Construction, Inc. v. Monterey Mechanical Co*., *supra*, 125 Cal.App.4th at p. 386.)

Although "promissory estoppel is an equitable doctrine [and] courts are given wide discretion in its application" (*US Ecology, Inc. v. State of California*, *supra*, 129 Cal.App.4th at p. 902, citing *C & K Engineering Contractors v. Amber Steel Co*., *supra*, 23 Cal.3d at pp. 7-8), "[t]he existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the *only* one that can be reasonably drawn from the evidence. [Citation.]" (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305, italics added.) More particularly, whether the reliance was reasonable is a question of fact unless reasonable

---

**1** Section 90 of the Restatement Second of Contracts has been judicially adopted in California. (*C & K Engineering Contractors v. Amber Steel Co*. (1978) 23 Cal.3d 1, 6.)

minds could reach only one conclusion based on the evidence, in which case the question is one of law. (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 187, citing *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

Flintco contends that the trial court erred in finding Flintco's reliance was unreasonable. Necessarily, Flintco's argument is that the record lacks substantial evidence to support the court's finding of unreasonable reliance. (See *H. W. Stanfield Constr. Corp. v. Robert McMullan & Son, Inc.* (1971) 14 Cal.App.3d 848, 852 (*Stanfield*).) As evidence of reasonableness, Flintco observes that it had no indication TEC would not honor the bid until August and cites Coffey's testimony that it "would be reasonable for [Flintco] to rely on [TEC's] bid if [TEC's] bid was complete . . . and the [low] number or close to the [low] number."

While there may be some evidence of reasonableness, we cannot say as a matter of law that there is no substantial evidence to support the contrary finding. The trial court found that TEC's bid contained conditions that were material to its bid price, and which if omitted, would have considerably increased the price. The court found therefore that Flintco's reliance on the bid price alone was not reasonable. There is substantial evidence in the record to support that finding. The 35 percent deposit requirement was underscored and written in all capital letters directly beneath the bid price and was necessary to lock in TEC's suppliers' costs; TEC would not accept any liability for liquidated damages; TEC's bid contained an exclusion for bonds; and contained a 3 percent per quarter escalation in price if the bid were not accepted by Flintco within the 15-day period the bid was open. Under the circumstances, where Flintco reviewed bids for bonding, length of time the bid would remain open, and "red flags" to avoid problems during negotiations that could cause it to lose the subcontractor, the evidence supports the trial court's finding that Flintco's reliance on the bid price alone while ignoring the material terms and conditions was unreasonable.

Flintco also relies on case law for the proposition, based on custom and practice in the business of lump-sum contracting, that conditions in a bid are irrelevant and so

8

Flintco reasonably relied on the bid price only.[2]  Flintco cites *Saliba-Kringlen*, *supra*, 15 Cal.App.3d 95 that, "the customary practice in the construction industry is for the general contractor who is awarded a contract to enter into a written contract with the subcontractor, which written contract embraces far more than the price which the subcontractor has bid by telephone.  The additional matters would include such things as whether the subcontractor would furnish a bond, who would provide for insurance, how payments would be made and many other matters.  Although the provisions other than price are not identical in all subcontracts generally . . . *price is the principal item* as is evident from the fact (as shown by the evidence) that seldom does a general contractor fail to reach an agreement with the subcontractor whose bid is low." (*Id*. at p. 103, italics added.)

But, as *Saliba-Kringlen* also stated, "[w]hether a general contractor is entitled to rely upon the bid of a proposed subcontractor must be decided on the basis of *the facts involved in the particular case before the court*." (*Saliba-Kringlen*, *supra*, 15 Cal.App.3d at p. 103, italics added.)  Here, the court determined that it was unreasonable for Flintco to rely solely on the price in the bid while ignoring terms and conditions stated therein, which were material to the bid's price itself.  Custom and practice cannot alter that result.  Unlike the cases Flintco cites:  *Saliba-Kringlen*, *Drennan*, and *Stanfield*, where the bids were made orally and were comprised of price only, TEC's bid was written and contained terms and conditions that were underscored and material because they affected the price.  Nor does TEC claim it made a mistake in the bid.  Thus, the justification in *Drennan* for

---

**2**     At oral argument, Flintco relied heavily on *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc*. (2012) 211 Cal.App.4th 230, to support its contention that it reasonably relied on the bid price only.  *Barnhart* is irrelevant as it involved an appeal from an order denying an attorney fee motion and the only issue there was whether the general contractor, who won its promissory estoppel claim below, was the prevailing party "on a contract" such as would entitle it to attorney's fees under Civil Code section 1717.  The opinion never addressed the substance of the underlying promissory estoppel claim. " ' "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." ' [Citations.]" (*Palmer v. GTE California, Inc*. (2003) 30 Cal.4th 1265, 1278.)  *Barnhart* therefore does not support Flintco's reasonable reliance argument.

invoking the equitable doctrine of promissory estoppel does not apply here. (*Drennan*, *supra,* 51 Cal.2d at p. 416 ["the loss resulting from the mistake should fall on the party who caused it"]; *Saliba-Kringlen*, *supra*, 15 Cal.App.3d at pp. 100-101 [subcontractor claimed mistake in bid]; *Stanfield*, *supra*, 14 Cal.App.3d at p. 852 [same].)

When a general contractor uses a subcontractor's "offer in computing his own bid, he bound himself to perform in reliance on defendant's terms." (*Drennan*, *supra*, 51 Cal.2d at p. 415.) Hence, "a general contractor is not free to . . . . reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." (*Ibid.*) Flintco's letter of intent, which was expressly made "*contingent upon the following terms and conditions*" that conflicted with TEC's offer, along with Flintco's standard-form subcontract, which as the trial court found, varied materially from the terms of TEC's bid, constituted a rejection of TEC's bid and a counteroffer, and terminated Flintco's power to accept TEC's original bid. (*Saliba-Kringlen, supra*, 15 Cal.App.3d at p. 107, fn. 2; Civ. Code, § 1585 ["A qualified acceptance is a new proposal"].) It is irrelevant to the result here that Flintco did, or may have been able to, negotiate the terms of a subcontract with TEC because as soon as Flintco communicated a response to TEC's bid that differed materially from TEC's offer, Flintco lost its power to accept TEC's bid.

DISPOSITION

The judgment is affirmed.  Appellant to bear costs on appeal.


ALDRICH, Acting P. J.


We concur:


LAVIN, J.


HOGUE, J.[*]


---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11

Filed 7/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FLINTCO PACIFIC, INC., | B258353 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. YC067984) |
| v. | |
| TEC MANAGEMENT CONSULTANTS, INC., | ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |
| Defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on June 21, 2016, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

[There is no change in the Judgment.]

_____

ALDRICH, Acting P. J.             LAVIN, J.             HOGUE, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.