Filed 2/22/18; Certified for Publication 3/19/18 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WEST COAST AIR CONDITIONING COMPANY, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, <br><br> Defendant and Appellant. | D071106 <br><br><br> (Super. Ct. No. 37-2015-00017334-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman and Joan M. Lewis, Judges. Affirmed.

Xavier Becerra, Attorney General, Douglas J. Woods, Assistant Attorney General, Stepan A. Haytayan and Jeffrey A. Rich, Deputy Attorneys General, for Defendant and Appellant.

Finch, Thornton & Baird, P. Randolph Finch Jr. and Jason R. Thornton, for Plaintiff and Respondent.

We consider in this case whether plaintiff West Coast Air Conditioning Company, Inc. (West Coast) was entitled to recover under a promissory estoppel theory its bid preparation costs in the stipulated amount of $250,000, after it successfully challenged the award of a public works contract by the State of California Department of Corrections and Rehabilitation (CDCR) to real party in interest Hensel Phelps Construction Co. (HP).

The court found HP's bid to update the Ironwood State Prison Heating, Ventilation and Air Conditioning System (subject project) illegal and nonresponsive as a matter of law. As a result, the court granted West Coast's request for a permanent injunction, preventing HP from performing any additional work on the subject project.

Although HP had only performed about 8 percent of the contract when the injunction issued, and although West Coast ultimately proved it was the lowest responsible bidder (see Pub. Contract Code,[1] § 10108, discussed *post*) when granting the injunction, the court refused to command CDCR to award West Coast the contract for the subject project, despite the court's finding in a previous order that West Coast should have been awarded the contract.

As we explain, we conclude the court properly exercised its broad equitable authority in awarding West Coast its bid preparation costs of $250,000. We thus reject CDCR's argument that West Coast as a matter of law was not entitled to recover such costs because West Coast's bid allegedly was nonresponsive and because West Coast had obtained a permanent injunction without any additional relief. Affirmed.

---

[1]     Unless otherwise noted, all further statutory references are to the Public Contract Code.

2

FACTUAL AND PROCEDURAL OVERVIEW

CDCR in February 2015 published an "invitation for bids" (IFB) for the subject project, which involved "building a new central plant" to provide air conditioning in, and a reroof of, the Ironwood prison, an "active" and "[f]ully occupied prison." In compliance with California law (see § 10108), the IFB provided the "[a]ward of the contract, if it will be awarded, will be to the lowest responsible bidder whose proposal complies with all requirements prescribed." West Coast, HP, and four other companies submitted bids to construct the subject project.

In early May 2015, CDCR awarded HP the contract for the subject project, as HP then was ostensibly found to be the lowest bidder with a bid of about $88 million. CDCR issued a list of bidders that showed West Coast was the next lowest bidder with a bid of about $98 million. Both bids were less than CDCR's engineer's estimate of $103 million for the subject project.

In mid-May 2015, West Coast filed a verified petition for a writ of ordinary mandate pursuant to Code of Civil Procedure section 1085, subdivision (a) and a complaint seeking injunctive relief and asserting a promissory estoppel cause of action (collectively, petition) against CDCR and real party in interest HP.[2] In the petition, West Coast sought to enjoin CDCR from awarding the contract for the subject project to HP and/or to nullify that award. As relevant to this appeal, in the prayer for relief West

_____

[2]     West Coast's third cause of action for promissory estoppel, the only claim at issue in this appeal, did not include real party in interest HP.

3

Coast requested "general damages in an amount sufficient to reimburse West Coast for its bid preparation costs" and interest.

In support of its petition, West Coast alleged HP's bid suffered from myriad defects, including failing to list the license numbers of about 17 subcontractors among other missing subcontractor information, which the petition alleged gave HP additional time over its competitors to "solicit, receive and negotiate subcontractor prices and price cuts"; submitting a bid containing "typographical/arithmetical errors"; and submitting a revised bid after the deadline that included substantial alterations to the percentages of work that HP's subcontractors would perform. Because these changes materially affected HP's bid price, West Coast's petition further alleged CDCR as a matter of law was precluded from waiving the defects in HP's bid.

On July 1, 2015, West Coast filed a summary judgment type motion asking the court to grant its petition. Despite West Coast's pending motion, about a week later CDCR issued a notice for HP to proceed with the subject project.

On September 11, 2015, the court granted West Coast's motion to set aside the contract award to HP. In so doing, the court found the mathematical errors in HP's bid, *which HP admitted*, were "material" to the bid price and that HP could have withdrawn its bid pursuant to section 5103, discussed *post*. Based on this finding, the court ruled HP's bid was nonresponsive as a matter of law. The court also then ruled that the contract for the subject project "should have been awarded to West Coast."

On September 16, 2015, West Coast sent CDCR a letter asking it to issue immediately a "stop work order" on the HP contract based on the court's September 11

4

order. West Coast in its letter also requested that it be awarded the contract for the subject project, which West Coast noted would "moot[]" its promissory estoppel cause of action in its petition. About a week later, CDCR responded that the September 11 order was a tentative decision only, refused to order HP to stop work, and rejected West Coast's request that it be awarded the contract.

On October 6, 2015, the court granted West Coast's ex parte application for a temporary injunction and ordered HP to stop immediately all work on the subject project "except tasks necessary for safe and prompt cessation of work."[3] The court set the permanent injunction hearing for December 11, 2015.

The court at the December 11 hearing granted West Coast's request for a permanent injunction prohibiting HP "from performing any work on the [subject project] pursuant to the contract between HP and [CDCR]," which the court in its September 11 order had found was "illegal." In granting the permanent injunction, the court found that West Coast would be harmed without an injunction and that it had no adequate remedy at law. In its December 11 order, the court agreed with the "argument raised by CDCR . . . that the [c]ourt *cannot* order that the contract be awarded to West Coast." (Italics added.) The court noted that specific finding was also reflected in its December 9, 2015 statement of decision.

---

[3] CDCR appealed the October 6, 2015 order granting West Coast's application for a temporary injunction. This court in January 2017 found CDCR's appeal moot in light of the trial court's order granting West Coast's request for a permanent injunction. (See *West Coast Air Conditioning Company, Inc. v. California Department of Corrections and Rehabilitation* (Jan. 9, 2017, D069033) [nonpub. opn.].)

West Coast's promissory estoppel cause of action was tried on May 9, 2016. Before trial, West Coast and CDCR stipulated to the following facts: "a. The bid documents published by CDCR for the Project stated a contract for the Project would be awarded to the lowest responsible bidder"; "b. CDCR received bids for the Project on April 30, 2015"; "c. CDCR awarded the Project contract to HP and on July 7, 2015, issued a notice to HP to proceed with the Project contract"; "d. Work on the Project began in July 2015"; "e. Pursuant to the temporary restraining order issued on October 6, 2105, CDCR and HP halted all work on the Project and have not recommenced any work"; "f. CDCR may endeavor to prove the amount of work completed by HP on the Project through declaration and documents"; and "g. West Coast's reasonable costs to prepare its bid submitted to CDCR on April 30, 2015 for the Project were and are in the sum of $250,000."

Two issues were tried in connection with West Coast's claim for $250,000. First, CDCR in its trial brief raised for the first time several grounds to support its contention that West Coast's bid was not responsive. And second, whether West Coast was entitled to its bid preparation costs despite being awarded injunctive relief but not the contract to construct the subject project.

Regarding its first contention, CDCR argued West Coast's bid was not responsive because it failed to include the "subcontractors' license types," "complete addresses," and the "subcontractors' corresponding percentages of the total Project bid price" for subs included in the West Coast bid. CDCR further argued that, as to subcontractors California Auger Boring (CAB) and Precision Air Balance (PAB), West Coast's bid had

6

listed incorrect subcontractor license numbers; and that as to one subcontractor, Chem Pro Lab, West Coast's bid had failed to list that subcontractor's license number.

Subject to an ongoing relevancy objection by CDCR, West Coast's chairman of the board, David Dudley, testified on the issue of whether West Coast's bid was "responsive."[4] The record shows CDCR neither cross-examined Dudley at the conclusion of his direct testimony nor offered any evidence to contradict his testimony.

Specifically, Dudley testified that West Coast obtained the plans and specifications for the subject project in February 2015; that the plans were contained in three volumes comprised of "several hundred sheets" of paper; that the specifications were contained in two volumes comprised of "probably a ream and a half of paper each"; that West Coast went "sheet by sheet" through the plans and specifications and determined it was interested in bidding on the subject project; that it then went "trade by trade" to identify how much work on the subject project it would perform versus its subs; that unlike many other contractors, West Coast put forth a "tremendous amount of work" in preparing its bids including in connection with the subject project; that unlike HP and other contractors who also bid on the subject project, West Coast intended to complete

---

4       Before Dudley took the stand, CDCR proffered the deposition testimony of two of its officials that, if CDCR found a bid was "not responsive" and thus did not meet the bid requirements, CDCR would send that bidder a "disqualification letter."  After taking the stand, Dudley confirmed that West Coast had never received a "disqualification letter" from CDCR concerning the subject project.  To the contrary, Dudley confirmed that, prior to any dispute, West Coast had received a list from CDCR identifying the "prime bidders" for the subject project and that West Coast was ranked second behind HP. Dudley concluded from this listing that CDCR *then* had found West Coast's bid to be responsive but not the lowest.

"all the mechanical work" itself; and that as such, West Coast spent more time preparing its bid than most other contractors who, according to Dudley, instead merely "pick[ed] up the phone" and called a mechanical company to do the work as a subcontractor.

Dudley further testified that West Coast was the second lowest bidder as far as price, but was the "low responsive bidder"; that over the 40 years he has worked for West Coast, he has been involved in preparing bids on "thousands" of projects; and that the first time West Coast learned CDCR considered West Coast's bid to be nonresponsive was when CDCR submitted its trial brief in connection with the May 9 trial.

Dudley next testified regarding the various issues CDCR alleged made West Coast's bid nonresponsive. With respect to the allegation that West Coast's bid failed to include subcontractor license types for about 20 subcontractors, Dudley explained that contractors bidding on the subject project were required to submit questions to CDCR by March 24, 2015; that one question which arose prebid was whether it was sufficient to include license classifications "A," "B," or "C" under "License Type"; and that CDCR responded in an addendum, "[b]idder to provide full license number on form." According to Dudley, the "full license number" is the number "issued by the California [Contractors] State License . . . Board for contracting as a contractor," much like a driver's license number issued to a driver. Dudley confirmed that West Coast's bid included the "actual contractor's license number" for each subcontractor, as CDCR had clarified in the addendum.

CDCR next claimed that West Coast's bid was nonresponsive because it failed to list the percentage of work that would be performed by West Coast's subcontractors.

8

Dudley testified that West Coast's bid listed the percentage of work that would be performed by each subcontractor for whom West Coast was seeking disabled veteran business enterprise (DVBE)[5] credit, and that the IFB required a 3 percent mandatory participation goal. He further testified that, if a bid reached a 5 percent DVBE credit, the bid was entitled to a $500,000 incentive, which in fact West Coast received in this case.

According to Dudley, West Coast listed the percentages of work performed by all of its DVBE subcontractors. However, for all non-DVBE subcontractors, West Coast listed the subcontract price for each, but not the percentages because West Coast was not seeking any DVBE credit for these remaining subcontractors. Dudley noted there was no requirement in either the IFB or any of the prebid addenda requiring a bidder to list percentages for subcontractors that were *not* being claimed for DVBE incentive credit.

CDCR alleged West Coast's bid also was deficient because it failed to include for each subcontractor the subcontractor's name; business location, including street address, city, state and zip code; and contact person, including telephone and facsimile numbers, and e-mail addresses. Dudley confirmed all required subcontractor information was contained in West Coast's bid, despite CDCR's contention otherwise. As noted, Dudley's testimony, including on this issue, was not refuted by CDCR.

CDCR also alleged West Coast's bid contained an error with respect to two of its subcontractors. As to CAB, Dudley admitted the West Coast bid had mistakenly transposed two numbers when it listed this sub's license number. However, Dudley

---

5    Dudley testified that a DVBE business was a "subcontractor or vendor that's owned and operated by a disabled veteran."

confirmed West Coast's bid had properly listed the Department of Industrial Relations (DIR) public works contractor number for CAB, which then could be used to confirm this subcontractor's license number via the DIR's website. Dudley noted *HP's* bid had not listed any subcontractor license numbers but instead had included the DIR numbers of its subcontractors, which had passed muster with CDCR. As to the other subcontractor, PAB, Dudley testified the information in West Coast's bid with respect to this sub was absolutely correct.

Finally, CDCR alleged West Coast's bid was nonresponsive because it failed to include a subcontractor's license and/or DIR number for Chem Pro Lab. However, Dudley testified this company was to "provide chemicals and flushing agents to clean and treat the water pipe system for the air conditioning" portion of the subject project. As such, he further testified Chem Pro Lab was not a subcontractor but instead provided a service in connection with the subject project. In fact, Dudley noted Chem Pro Lab neither had a subcontractor's license nor a DIR number.

Dudley was asked whether the court's issuance of an injunction on December 11 provided West Coast "effective relief." Dudley noted that West Coast's bid included several subcontractors also listed by HP, including the electrical subcontractor who already had started work at the subject project when HP's bid was found illegal as a matter of law. After the court granted West Coast's writ of mandate, Dudley testified that he reached out to CDCR officials and indicated that West Coast was still ready, willing, and able to take on the subject project. West Coast even agreed to credit against its bid the work HP had already performed on the subject project.

Dudley testified that he also personally contacted the electrical subcontractor that had started work under the HP contract and that this subcontractor tentatively agreed to continue working on the subject project if West Coast obtained the contract. Dudley also communicated with "all" of West Coast's other "major subs" and confirmed they too would be willing to commence and/or continue work on the subject project if the contract was awarded to West Coast. CDCR, however, refused to award the contract to West Coast after the HP contract was nullified.

Based on conversations with CDCR officials, Dudley testified that CDCR was never going to allow West Coast to step in and proceed with the subject project. Dudley also testified that, since the injunction issued, no work has been done on the subject project; that if CDCR sought rebids for the subject project, West Coast would have to start the bid process anew because prices and labor costs had changed; and that, unless the court awarded West Coast its bid preparation costs, all of West Coast's efforts in preparing its bid "was for nothing."

Dudley further testified that West Coast in any event would not bid on any future project involving CDCR "[b]ecause of the way CDCR has addressed and handled this whole situation, both toward [West Coast] and [its] current actions towards [HP] and the subcontractors who did work at CDCR's direction[, which] has made it clear that the administration of CDCR does not care to follow public contract law or ethical treatment of contractors."

CDCR next proffered the declaration testimony of one of its project managers who stated that about 8 percent of the work at the subject project was completed when the

11

injunction issued; but that virtually all such work performed before the work stoppage was "of no value." As a result, the project manager opined that about "99 percent of the project's work remains to be performed when the project is rebid."

On May 16, 2016, the court issued its decision after trial awarding West Coast the stipulated sum of $250,000 on its promissory estoppel cause of action. West Coast subsequently was awarded prejudgment interest of about $3,644. This appeal followed.[6]

DISCUSSION

A. *Responsiveness*

The issue of whether the court erred in awarding West Coast $250,000 for its bid preparation costs involves a mixed question of law and fact. Specifically, whether West Coast's bid was "responsive" is a question of fact. (See *MCM Const. Inc. v. City & County of San Francisco* (1998) 66 Cal.App.4th 359, 368 [noting a bid is responsive "if it promises to do what the bidding instructions require"]; see also *Flintco Pacific, Inc. v. TEC Management Consultants, Inc.* (2016) 1 Cal.App.5th 727, 734 (*Flintco*) [noting the " 'existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the *only* one that can be reasonably drawn from the evidence' "], quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.)

---

6 The court postjudgment denied the motion of West Coast to recover its reasonable attorney fees under Code of Civil Procedure section 1021.5, which is the subject of a separate, albeit related, appeal in case number D071611 that is being filed concurrently with the instant appeal.

However, the issue of whether West Coast was authorized under section 10108 to recover such costs is a question of law. (See *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transp. Auth.* (2000) 23 Cal.4th 305, 313 (*Kajima*) [interpreting Pub. Utilities Code, § 130232, subd. (a), which is similar to § 10108 at issue in the instant case, to allow the lowest responsible bidder to recover bid preparation costs but not lost profits].)

As summarized *ante*, CDCR asserted several grounds at trial to show West Coast's bid was nonresponsive. West Coast in turn proffered the testimony of Dudley, its chairman of the board who has worked for West Coast for 40 years, to refute CDCR's claim. Other than the bid document itself, CDCR offered no evidence opposing Dudley's testimony. Based on such testimony, the court found West Coast's bid was responsive, as also summarized *ante*.

We conclude there is overwhelming evidence in the record, as summarized *ante*, to support the court's finding that West Coast's bid was responsive. (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 [noting the oft-cited principle that in "reviewing a judgment . . . following a bench trial, we . . . apply a substantial evidence standard of review to the trial court's findings of fact," and further noting that "[u]nder this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings"]; see also *Flintco*, *supra*, 1 Cal.App.5th at p. 735.)

13

CDCR nonetheless contends on appeal that the court erred when it admitted Dudley's testimony because the court was limited to the "four corners" of West Coast's bid in determining the responsiveness issue. To support this contention, CDCR relies on the rule that whether a bid is responsive is "[u]sually . . . determined from the face of the bid without outside investigation or information." (*Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432, 1438, citing *Taylor Bus Service, Inc. v. San Diego Board of Ed.* (1987) 195 Cal.App.3d 1331, 1342 (*Taylor*).) We find this general rule inapplicable to the present situation.

First, in our view, it would be grossly unfair to preclude West Coast from proffering evidence on the issue of whether its bid was responsive when CDCR waited until the eve of trial to raise this issue for the first time and when the court already had granted West Coast's writ of mandate petition and request for permanent injunction.

Indeed, the overarching issue in this case is not whether CDCR considered West Coast's bid responsive when CDCR was initially analyzing the bids it received for the subject project and determining whether to award a contract, if at all, to the lowest responsible bidder. (See § 10108.) Rather, the issue in the instant case is whether West Coast, after proving the elements of its promissory estoppel cause of action, was nonetheless precluded as a matter of law from recouping its bid preparation costs, as CDCR contends, because West Coast obtained a permanent injunction preventing HP from continuing to work under the illegal contract. As such, we reject CDCR's contention the court erred in considering the trial testimony of Dudley in finding West Coast's bid was responsive.

14

Second, there is sufficient evidence in the record to support the (tacit) finding that CDCR initially found West Coast's bid responsive when CDCR awarded HP the contract for the subject project. The deposition testimony of CDCR officials offered by CDCR at trial established that, if CDCR found a bid did not meet the bid requirements, CDCR would send the bidder a "disqualification letter." Dudley's uncontradicted testimony was that West Coast received no such letter from CDCR after West Coast submitted its bid on the subject project. Nor was there any evidence in the record that CDCR otherwise provided West Coast with any notice that its bid was not responsive. (See *Taylor*, *supra*, 195 Cal.App.3d at p. 1343 [noting a bidder such as West Coast whose bid is deemed not responsive by an agency "is entitled to notice of that fact and is entitled to submit materials . . . concerning the issue of responsiveness," although an agency is not required to conduct a hearing or produce findings].)

Third, limiting the determination of whether a bid is responsive to the four corners of a bid—particularly when, as here, a public works contract was found to be misawarded by a public agency—would undermine the public policy in competitive bidding laws of " 'ensur[ing] full compliance with competitive bidding statutes as a means of protecting the public from misuse of public funds,' 'provid[ing] all qualified bidders with a fair opportunity to enter the bidding process, thereby stimulating competition in a manner conducive to sound fiscal practices,' and 'eliminat[ing] favoritism, fraud, and corruption in the awarding of public contracts.' " (See *Kajima*, *supra*, 23 Cal.4th at p. 314, quoting § 100, subds. (b)-(d).)

Finally, we reject CDCR's contention that West Coast should be judicially estopped from contending its own bid was responsive in connection with the required subcontractor information because West Coast had earlier argued that HP's subcontractor information was insufficient. We conclude this contention is borderline frivolous.

The record shows the court invalidated HP's bid and found it illegal as a matter of law based on HP's admission that its bid contained arithmetic errors that were "material to the bid price," which in turn could have led HP to withdraw its bid pursuant to section 5103.[7] What's more, the record shows the court found the "failure to list subcontractor license numbers" was a "waivable defect" because CDCR was able to obtain such information from the DIR. Thus, the court did not rely on subcontractor information, or the lack thereof, in finding HP's bid was unlawful as a matter of law.

We interpret CDCR's estoppel argument as a thinly disguised challenge to the court's finding that West Coast's bid provided sufficient subcontractor information to make its bid responsive. As a court of review, we cannot, and will not, make a different finding when substantial evidence in the record supports one or more findings of the trier of fact, which as noted, is the case here with respect to the responsiveness issue. (See *Thompson*, *supra*, 6 Cal.App.5th at p. 981; *Flintco*, *supra*, 1 Cal.App.5th at p. 735.)

---

[7] Section 5103 provides a bid may be withdrawn if the "bidder shall establish to the satisfaction of the court that: [¶] (a) A mistake was made. [¶] (b) He or she gave the public entity written notice within five working days, excluding Saturdays, Sundays, and state holidays, after the opening of the bids of the mistake, specifying in the notice in detail how the mistake occurred. [¶] (c) The mistake made the bid materially different than he or she intended it to be. [¶] (d) The mistake was made in filling out the bid and not due to error in judgment or to carelessness in inspecting the site of the work, or in reading the plans or specifications."

16

B. *Recovery of Bid Preparation Costs*

CDCR next contends the court erred as a matter of law in awarding West Coast its bid preparation costs because West Coast already had obtained "effective" relief when the court granted its request for a permanent injunction preventing HP from continuing to perform the contract on the subject project. In support of this theory, CDCR relies exclusively on *Kajima*, *supra*, 23 Cal.4th 305.

In *Kajima*, our high court concluded the lowest responsible bidder involved in two rounds of bidding for a public works project was entitled to recover a portion of its bid preparation costs after the public agency, the Los Angeles Metropolitan Transportation Authority (MTA), initially accepted no bids in "round 1," as was its right, and subsequently awarded the contract for the project in "round 2" to an entity that turned out not be the lowest responsible bidder. (*Kajima*, *supra*, 23 Cal.4th at p. 308.) The *Kajima* court acknowledged that under such circumstances, a bidder deprived of a public contract because of a "misaward" of that contract " 'has neither a tort nor a breach of contract action against the public agency,' " but must instead rely on a promissory estoppel theory to recover monetary relief, if at all. (*Id.* at p. 315, fn. 2.)

In reaching its decision, the *Kajima* court noted the application of a promissory estoppel theory to the "disappointed bidder context" was an "imperfect[]" "fit[]": "Promissory estoppel was developed to do rough justice when a party lacking contractual protection relied on another's promise to its detriment. Here, we use promissory estoppel primarily to further certain public policies by creating a damages remedy for a public entity's statutory violation. Moreover, unlike the typical promissory estoppel situation,

17

the MTA retains discretion to reject all of the bids as it did in round 1; the lowest bidder has no absolute right to be awarded the contract." (*Kajima*, *supra*, 23 Cal.4th at p. 315.)

As discussed *ante*, the *Kajima* court noted that allowing under a promissory estoppel theory "some measure of damages once injunctive relief is no longer effectively available" would actually promote the "purposes of the competitive bidding laws by encouraging proper challenges to misawarded public contracts by the most interested parties, and deterring government misconduct." (*Kajima*, *supra*, 23 Cal.4th at p. 314.)

In addressing what it meant by "effective" injunctive relief, the *Kajima* court in a footnote stated: "Of course, as the parties agree, the most effective enforcement of the competitive bidding law is to enforce by injunction the representation that the contract will be awarded to the lowest responsible bidder. This is generally done by setting aside the contract award to the higher bidder. (See, e.g., *City of Inglewood*[*-Los Angeles County Civic Center Authority v. Superior Court* (1972)] 7 Cal.3d [861,] 870; *Monterey Mechanical* [*Co. v. Sacramento Regional County Sanitation Dist.* (1996)] 44 Cal.App.4th [1391,] 1412.) However, as a practical matter, by the time the basis for relief is persuasively demonstrated, the underlying contract may already have been substantially or fully performed. That is apparently what happened here, and this scenario seems recurring. (See, e.g., *Swinerton* [*& Walberg Co. v. City of Inglewood-L.A. County Civil Center Authority* (1974)] 40 Cal.App.3d [98,] 103 [noting 'it is now too late' for injunctive relief to be effective].) Hence, once injunctive relief is no longer an effective remedy, the question arises whether monetary relief is available, and if so, what the

18

appropriate measure of damages is in this context."  (*Kajima*, *supra*, 23 Cal.4th at p. 313, fn. 1.)

As noted, CDCR contends the application of *Kajima* to the instant case precluded the court as a matter of law from awarding West Coast its bid preparation costs because West Coast already had obtained "effective" relief when the court granted its permanent injunction.  We disagree.

*Kajima* makes clear that damages generally will not be available under a promissory estoppel theory unless it is possible both to set aside the misawarded contract *and* to award the contract instead to the lowest responsible bidder.  Here, the HP contract was set aside by ordinary writ of mandate, thus satisfying the first "element" of *Kajima*.  The difficulty in the instant case is the second "element"—awarding the contract to the next lowest responsible bidder.  As noted *ante*, CDCR refused to award West Coast the contract to construct the subject project even after the writ of mandate issued.

Unlike *Kajima* where our high court found the underlying public works contract had "been substantially or fully performed" (see *Kajima*, *supra*, 23 Cal.4th at p. 313, fn. 1), in the instant case when the court found the HP contract illegal and set it aside only about 8 percent of the work had been completed on the subject project.  In addition, CDCR submitted uncontradicted evidence that most of the work performed on the subject project was for naught, as CDCR estimated that 99 percent of the project remained uncompleted when HP stopped work.

What's more, the record shows the court in its December 9 statement of decision and in its December 11 order accepted CDCR's argument that the court could neither then

19

find West Coast's bid to be responsive—a finding which only came much later and only in connection with the award of West Coast's bid preparation costs—nor enforce the representation of CDCR to award the contract for the subject project to the lowest responsible bidder, namely West Coast.  (See § 10108.)  The court refused to enforce this representation, despite the recognition of our high court in *Kajima* that, once an unlawful contract is set aside, enforcement by injunction (and not by writ of mandate) of the "representation that the contract will be awarded to the lowest responsible bidder" is the "most effective enforcement of the competitive bidding law."  (See *Kajima*, *supra*, 23 Cal.4th at p. 313, fn. 1; see also *Eel River Disposal and Resource Recovery, Inc. v. Humboldt* (2013) 221 Cal.App.4th 209, 240, fn. 12 [noting that the trial court on remand should consider whether to award to the low bidder a 10-year exclusive franchise to collect and dispose of solid waste because the "10-year exclusive franchise has not yet been fully or even substantially performed by real party in interest," and thus further noting that "it may in this case be possible to enforce by *injunction* the representation of the [request for proposal] that the franchise will be awarded to the lowest responsible bidder" (italics added)]; but see *Baldwin–Lima–Hamilton Corp. v. Superior Court* (1962) 208 Cal.App.2d 803, 817 [noting where public agency has reserved, in its advertisement for bids, the right to reject all bids, a court has no power to compel an agency by *writ of mandate* to award the contract to the next highest bidder even if the agency improperly awarded the public works contract to a nonresponsive bidder]; *Charles L. Harney, Inc. v. Durkee* (1951) 107 Cal.App.2d 570, 576–578 [concluding no right exists in the lowest bidder to compel the acceptance of its bid by a *writ of mandate* when the competitive

bidding statute (i.e., former Gov. Code § 14335) allowed for the rejection of all bids of a public improvement project if the acceptance of the lowest responsible bid was not in the best interests of the state].)

The issue of whether the court was correct in finding it could not compel CDCR to award the contract for the subject project to West Coast after the court nullified the HP contract is not before this court. (See *Kajima*, *supra*, 23 Cal.4th at p. 313, fn. 1.) Neither party has briefed the issue of what, if any, remedies were available to West Coast other than recovery of its bid preparation costs.[8] And it is quite clear from the record in this case that neither party appears at all interested in entering into a contractual relationship with the other party, including for the subject project which involves nearly a $100 million contract.

We conclude that the issuance of a permanent injunction in favor of West Coast, the lowest responsible bidder, without *either* an award of the public works contract to it *or* an award of damages equal to its bid preparation costs, would result in an inadequate remedy to West Coast. Indeed, West Coast prepared its bid and incurred $250,000 in costs in reliance on CDCR's representation that if a contract was awarded, which turned

_____

[8]     Although the parties appear to agree with the court that it lacked the authority to enforce by injunction the representation of CDCR to award the contract on the subject project to the lowest responsible bidder (i.e., West Coast) after it granted West Coast mandamus relief, we note in passing that we are *not* bound to accept concessions of the parties " 'establishing the law applicable to a case.' " (See *Bell v. Tri–City Hospital Dist.* (1987) 196 Cal.App.3d 438, 449; see also *Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 327 [refusing to accept the defendant's concession made during oral argument regarding the construction of Civil Code, § 2983.4, and the right of the plaintiff to keep about $15,000 tendered by the defendant].)

21

out to be the case, it would be to the lowest responsible bidder, which turned out *not* to be the case. (See § 10108; see also *Kajima*, *supra*, 23 Cal.4th at p. 313, fn. 1.)

Allowing West Coast to recover its bid preparation costs under the circumstances of this case will further the important public policies underlying the competitive bidding laws of "encouraging proper challenges to misawarded public contracts by the most interest parties, and deterring government misconduct" (*Kajima*, *supra*, 23 Cal.4th at p. 314) and promote "rough justice" between West Coast and CDCR (see *id.*, at p. 315).

Indeed, Dudley testified that he personally attempted to negotiate a resolution of West Coast's dispute by suggesting more than once that CDCR award West Coast the contract for the subject project. Dudley also testified that West Coast was ready, willing, and able to perform the contract once the court nullified the HP contract; and that West Coast had secured from many of its key subcontractors a commitment to work, or continue to work as the case may be (i.e., the electronic subcontractor), on the subject project under a new contract with West Coast.

Yet, despite what appeared to be a relatively smooth transition from the illegal HP contract to a new contract with West Coast, and despite West Coast agreeing to offset from its bid the work already performed by HP under the illegal contract, Dudley testified that CDCR was never going to award West Coast the contract to build the subject project, which CDCR has not denied.

On this record, we thus conclude the court properly exercised its broad equitable authority when it awarded West Coast its bid preparation costs in the stipulated sum of $250,000 under a promissory estoppel theory.

22

DISPOSITION

The award in the stipulated sum of $250,000 to West Coast for recovery of its bid preparation costs is affirmed. Each party to bear its own costs on appeal.


                                                                          BENKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

Filed 3/19/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WEST COAST AIR CONDITIONING COMPANY, INC.,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>      Defendant and Appellant. | D071106<br><br>(Super. Ct. No. 37-2015-00017334-CU-WM-CTL)<br><br>ORDER GRANTING PUBLICATION |

THE COURT:

The opinion in this case filed February 22, 2018, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), West Coast Air Conditioning Company, Inc.'s request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties