Filed 11/8/22 In re M.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.G., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E079180 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J279786/87) |
| v. | OPINION |
| M.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Conditionally reversed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

The only issues in this appeal from the termination of parental rights are whether there was an adequate inquiry into the children's ancestry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and whether any error was prejudicial. We find prejudicial error under the standard articulated in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*) and therefore conditionally reverse the judgment.[1]

BACKGROUND

Defendant and appellant M.G. is the mother of the two children in this dependency matter, one born in February 2006, the other in July 2013, both of whom share mother's initials. Plaintiff and respondent San Bernardino County Children and Family Services (CFS) filed section 300 petitions regarding the children in February 2019. The children's father initially participated in the dependency proceedings, but he died in May 2019.

In advance of the February 2019 detention hearing, both mother and father responded "No" on a CFS form inquiring if they "have/may have Native American Ancestry." At the disposition hearing in February 2019, both mother and father confirmed they had "no known Indian ancestry." On CFS forms, the children's maternal grandmother and maternal aunt also denied any Indian ancestry. Both the maternal grandmother and maternal aunt attended the detention hearing, and both confirmed their earlier responses.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. In addition, because ICWA uses the term "Indian," we do the same for consistency, even though we recognize that other terms, such as "Native American" or "indigenous," are preferred by many.

2

For more than a year, from April 2020 to August 2021, the children were placed with a paternal aunt and uncle who lived in Oklahoma. CFS reported to the juvenile court that the paternal aunt had "denied Native American ancestry and did not provide any other relatives that may have Native American ancestry or information regarding possible Native American ancestry in the family." The record does not demonstrate, however, that CFS asked other paternal relatives who were part of the children's "safety network" about possible Indian ancestry. Such relatives include "the paternal grandmother, the paternal great-grandmother, cousins, [and] other aunts and uncles."

In June 2022, after reunification efforts were unsuccessful, the juvenile court terminated mother's parental rights to the children and selected adoption as their permanent plan.

DISCUSSION

Mother contends on appeal that CFS did not fulfill its duty of initial inquiry under ICWA because it failed to ask certain paternal relatives about possible Indian ancestry. CFS denies error and, in the alternative, contends that any arguable error is not prejudicial. Applying *Benjamin M.*, we find prejudicial error and therefore conditionally reverse the judgment.

"When ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding. [Citation.] If the tribe does not assume jurisdiction, the state court must nevertheless follow various heightened procedural and substantive requirements, such as stricter removal standards and mandatory placement preferences

3

that promote keeping Indian children with family members or members of their tribe." (*In re K.T.* (2022) 76 Cal.App.5th 732, 741.) "Violations of ICWA '"render[] the dependency proceedings, including an adoption following termination of parental rights, vulnerable to collateral attack if the dependent child is, in fact, an Indian child."'" (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.)

ICWA's concern is with Indian children, and "[b]ecause it typically is not self-evident whether a child is an Indian child, both federal and state laws mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.)

"The duty of initial inquiry arises, in part, from federal regulations under ICWA stating that '[s]tate courts must ask each participant in an . . . involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child' and that [s]tate courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.' [Citation.] Thus, the federal regulation places a duty on only 'courts' to inquire or instruct 'participants' and 'parties' to a case." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.)

"State law, however, more broadly imposes on social services agencies and juvenile courts (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.' [Citation.] When the agency takes the child into temporary custody, its duty to inquire 'includes, but is not

4

limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' [Citation.] State law also expressly requires the juvenile court to ask participants who appear before the court about the child's potential Indian status." (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 741-742.)

"If the initial inquiry gives the juvenile court or the agency 'reason to believe' that an Indian child is involved, then the juvenile court and the agency have a duty to conduct 'further inquiry' [citation], and if the court or the agency has 'reason to know' an Indian child is involved, ICWA notices must be sent to the relevant tribes." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.)

Here, neither the duty of further inquiry nor ICWA's notice provisions are at issue because no one has contended there is reason to believe the children are Indian children. Rather, mother focuses on CFS's alleged failure during its initial inquiry to gather information that *could have* triggered additional duties.

The paternal aunt in Oklahoma with whom the children were placed for a time was asked about possible Indian ancestry. As mother emphasizes, however, although CFS had some contact with the children's paternal grandmother on other issues, there is no indication in the record that she was asked about potential Indian ancestry. We also note that it does not appear the paternal uncle (paternal aunt's husband) was asked about possible Indian ancestry. As well, the social worker identified several other relatives,

5

including "a paternal great-grandmother, cousins, [and] other aunts and uncles" as part of the children's "safety network." There is also no evidence that CFS asked these individuals about potential Indian ancestry. CFS therefore did not satisfy its duty of initial inquiry, which includes the duty to ask extended family members whether the child is, or may be, an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741; § 224.2, subd. (b).)

CFS cites *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 for the proposition that "complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family, including first and second cousins, plus every other person who has an interest in the child—is absurd at best and impossible at worst." (*Id.* at p. 1006.) CFS suggests that we should "reject a strict reading of section 224.2" and find the inquiry that it conducted close enough to count as no error, even though only some, but not all, of the children's extended family members were asked about possible Indian ancestry. For the reasons discussed in the dissent in *In re Ezequiel G.*, among others, we are not persuaded. (See *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1020 (J. Lavin, dissenting) [finding majority's analysis "misguided" and stating "There is nothing absurd or unworkable about applying the statute to the facts of this case"].)

In *Benjamin M.*, this court concluded that prejudice exists when "the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear

6

meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Other cases both before and after *Benjamin M.* have sometimes taken other approaches, and the issue is now pending before our Supreme Court. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777-778, review granted Sept. 21, 2022, S275578 ["California courts have staked out three different rules for assessing whether a defective initial inquiry is harmless . . . we propose a fourth rule for assessing harmlessness"].) We apply the *Benjamin M.* standard here.

It appears from the record that there were several paternal relatives—the paternal grandmother, in particular, as well as the paternal uncle with whom the children lived for more than a year—with whom CFS was in direct contact, but who were never asked about any potential Indian ancestry. We also infer that CFS likely had contact information for the "paternal great-grandmother, cousins, [and] other aunts and uncles" whom it identified as part of the children's "safety network," or at least had leads on where to obtain such contact information. While we cannot know how these extended family members would answer an ICWA inquiry, their answers would likely bear meaningfully on the determination of whether the children are Indian children. CFS's error of failing to ask them was therefore prejudicial.

CFS attempts to distinguish *Benjamin M.* on its facts, noting that the father in that case "never made an appearance in juvenile court and was never asked about any Indian heritage, and CFS never inquired of his extended family members despite having their information." Here, in contrast, father did appear and stated that there was no Indian

7

ancestry, and CFS did inquire of some, albeit not all, of the children's extended family members. It is not apparent, however, why that factual distinction should make a difference. Father may or may not have been fully aware of his own ancestry, and the same is true of his sister, the paternal aunt. Other extended family members may or may not have had different information, but that cannot be known until CFS asks them.

## DISPOSITION

The orders terminating parental rights to the children are conditionally reversed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and of Welfare and Institutions Code sections 224.2 and 224.3 (and, if applicable, the notice provisions as well), consistent with this opinion. If, after completing the initial inquiry, neither CFS nor the court has reason to believe or to know that the children are Indian children, the orders terminating parental rights as to them shall be reinstated. If CFS or the court has reason to believe that the children are Indian children, the court shall proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

CODRINGTON
Acting P. J.
FIELDS
J.