Filed 5/27/25  Estate of Lindsey CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| Estate of EDNA JETER LINDSEY, Deceased. | |
| | D083008 |
| JANE LINDSEY, | |
| Petitioner and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00151045-PR-TR-CTL) |
| CHARLES LINDSEY, et al., | |
| Objectors and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Loren G. Freestone, Judge.  Reversed and remanded.

David A. Kay for Plaintiff and Appellant.

Hughes & Pizzuto, Laurie E. Barber and Anne M. Rudolph for Objectors and Respondents.

When Edna Jeter Lindsey passed away, her testamentary trust had as its three named beneficiaries her son Charles, her daughter Jan, and another daughter, Jane, with whom Edna lived for the last ten years of her life.[1] Under the trust, Edna's bank accounts and home were to be divided equally among the three children. This case arises because, as is often the circumstance with testamentary dispositions, the best laid plans can sometimes go awry.

Following Edna's death, Jane sought an order from the probate court requiring that the trustee of the trust (trustee) distribute all the trust assets to her based on two independent arguments. She first claimed that the trust was or should have been amended to disinherit Charles and Jan because they pursued involuntary conservatorships over Edna and her estate after she gave her attorney and the trustee the discretion to disinherit any child who took those steps. Jane also invoked the doctrine of promissory estoppel, claiming that she reasonably and detrimentally relied on a promise Edna made to leave her the entire estate if she provided live-in care for the rest of Edna's life.

Neither theory was successful below, and Jane accordingly appeals. We agree with the probate court that Edna's instruction to her attorney was deliberately couched in discretionary language inconsistent with a mandate to disinherit any of her children. Thus, we do not disturb that ruling.

As for Jane's promissory estoppel claim, the probate court found that Edna's promise as to exactly *which* trust assets Jane would receive was uncertain and ambiguous, that Jane's reliance on a promise to receive Edna's entire estate was not reasonable because Edna would not have wanted to

---

[1]    Because the parties and other individuals share the same last name, we will refer to them by their first names for clarity.

totally disinherit her other children, and that Jane failed to show that she lost any professional opportunities in detrimental reliance on the promise. But the undisputed evidence from multiple sources revealed that, at the very least, Edna intended to leave the house to Jane. It also established that Jane's reliance on this narrower promise would have been both reasonable—because Charles and Jan would still inherit their share of Edna's financial accounts—and detrimental—for the personal sacrifices Jane made which the probate court disregarded. We therefore reverse the court's ruling on Jane's promissory estoppel claim and remand with instructions to resolve Charles and Jan's allegations that Jane procured this promise through undue influence.

## FACTUAL AND PROCEDURAL BACKGROUND

Edna created a revocable trust in 1986 in which she named her four children as beneficiaries: Charles, Jane, Jan, and Gweneth Lindsey. (*Lindsey v. Brito* (July 20, 2018, D073145) [nonpub. opn.] (*Lindsey*)). At the time of her death in September 2011, the only surviving beneficiaries were Charles, Jane, and Jan, as Gweneth predeceased Edna and had no children. (*Ibid.*) Under the terms of the trust, Jan was to receive Edna's personal property. The remaining trust assets—Edna's house and her investment and bank accounts—were to be divided equally among the named beneficiaries or their survivors. In her petition with the probate court, Jane claimed that either of two actions Edna took after the last trust amendment on December 2, 2002 required an order directing the trustee to distribute Edna's entire estate to her.

A. *Edna's December 2002 Letter to Karen Black*

On December 9, 2002, Edna signed a letter she and her then-attorney Karen Black had drafted (the 2002 letter). It instructed Black, "If any of

3

my children attempt to obtain a conservatorship against me, I hereby authorize you, or the agent under my power of attorney, to amend the Edna Jeeter [*sic*] Lindsey trust, to exclude as a beneficiary of my estate any child that has been involved in trying to obtain a conservatorship after this date, unless you and my trustee believe the conservatorship is appropriate at that time."[2]  Edna further explained, "I trust your judgment in this respect, and I believe you will resist a conservatorship as long as it can be avoided."

The conservatorship Edna mentioned was part of a long simmering discord between Edna and two of her children—Charles and Jan—with Jane tending to support Edna.  Edna's husband passed away in April 2000 while they were living in San Diego, California.  At that time, Charles lived in Tucson, Arizona, whereas Jane and Jan lived in different communities near Santa Cruz, California.  Shortly after her husband died, Edna moved to an apartment in Tucson to be close to Charles.  In September 2001, with Jane's help, Edna moved back into her San Diego house without telling Charles or Jan.  Rather than return to Santa Cruz, Jane moved into Edna's house and lived there until Edna's death in 2011.

Shortly after Edna returned to San Diego, Charles and Jan sought involuntary conservatorships over Edna's person and estate.  They took this step because they had been unable to reach Edna for three weeks after she left Tucson.  Charles and Jan accused Jane of "abduct[ing]" Edna in Tucson, helping "unload" one of Edna's checking accounts, and "shutting [Edna] away from the rest of her family and friends."  Adding to Charles and Jan's

---

[2]     By this time, Beverly Brito, a professional fiduciary, had been appointed as both Edna's attorney-in-fact under a durable power of attorney and the trustee of her trust.

4

concerns was the fact that Edna had been suffering from dementia and other cognitive and behavioral issues.

Edna wrote letters to Charles and Jan, making it clear that although she loved all her children "very much," she was "royally pissed" that they were trying to "take [her] and [her] activities over, tell [her] where to live, and "control [her] bank accounts and investments." Edna initially indicated she "did not want to see or talk to" either of them unless they withdrew their conservatorship petition. But by the time she signed the 2002 letter, she had planned to meet with all her children to discuss her wishes. In the 2002 letter, however, she instructed Black, "Should my children continue to harass me, or attempt in any fashion to control the management of my estate or my person . . . you are hereby directed to seek a restraining order on my behalf. If they continue to try to dictate where I live, with whom I live, and how I spend my time, I do not want anything more to do with them."

When Edna signed the 2002 letter, the conservatorship proceedings had been suspended at Charles and Jan's request, but they were put back on calendar in January 2003. Although Black filed an opposition to the petition, she was also attempting to settle the case with a limited conservatorship to facilitate communications between Edna and her children. The parties resolved the matter in February 2004 after Edna agreed to this arrangement and the appointment of a conservator. Despite the fact that Charles and Jan formally continued to pursue a conservatorship after Edna signed the 2002 letter, Black never amended the trust to exclude them as beneficiaries.

**B.** *Edna's January 2003 Promise to Jane*

In January 2003, after having lived in San Diego with Edna for sixteen months, Jane told her that she wanted to move back to Santa Cruz.

5

Starting in 1998, Jane worked in the Santa Cruz area as a relief veterinarian. Until sometime in 2005, which is when Jane transitioned to working mostly at clinics in and around San Diego, she and Edna would occasionally travel to Santa Cruz so Jane could work. Jane wanted to move back to Santa Cruz in part to purchase the veterinary clinic that she had to forgo buying in September 2001 because she needed to help Edna move from Tucson to San Diego.

Edna did not want to give up Jane's care and companionship, but she also did not want to move to Santa Cruz. According to Jane, Edna promised to leave her the house and "all her mutual funds" if she would stay in San Diego and provide Edna with live-in care for the rest of her life. Edna variously told others, including trustee Brito, that when she passed away, Jane would receive the house, the house and Edna's "investments," or "everything." This promise was not memorialized in writing by Edna, Jane, or Black, who did not recall hearing about it while Edna was still alive.

There is no dispute that Jane stayed with and cared for Edna until her death. As Jane described it, Edna was "velcroed" to her in that she "basically did what [Jane] did when [Jane] did it." Edna went with Jane to work, where she would need to be occupied with tasks such as helping the receptionists or assisting Jane during surgical procedures. When Jane was not working, she either was taking care of Edna or waiting in senior centers while Edna attended classes or played bridge. Because Edna slept in the same room as Jane, the only alone time Jane enjoyed was when Edna would watch television or go to bed early. Edna was in good physical health when Jane moved in with her. But by 2009, she needed a wheelchair or a walker and the help of a care assistant whenever she and Jane went out.

6

## C.    *The Probate Court Proceedings*

Edna had instructed her attorneys not to discuss her trust with any of her children. Thus, although Jane was aware of the 2002 letter, she did not learn until after Edna died that the trust had not been amended to disinherit Charles and Jan. Accordingly, in February 2012, Jane filed a "Petition Concerning Internal Affairs of Trust" under Probate Code section 17200 to obtain an order directing the trustee to distribute Edna's entire estate to her.

Jane advanced three theories to claim entitlement to Edna's entire estate, two of which she raises on appeal. She contended that the 2002 letter amended the trust to disinherit Charles and Jan. In the alternative, she claimed that Edna's oral promise to leave various assets to her, including the house, was enforceable under the doctrine of promissory estoppel.[3] Jane argued that Edna's promise should be enforced because she detrimentally relied on it by forgoing an opportunity to buy the veterinary clinic near Santa Cruz, devoting all her free time to caring for Edna and, as a result, being unable to work full time. Charles and Jan objected to Jane's petition, claiming that Edna did not amend the trust to disinherit them and that there was no evidence to corroborate her oral promise to leave her entire estate to Jane.

The probate court denied the petition, entering judgment in favor of Charles and Jan for the reasons provided in a statement of decision. It found that the 2002 letter did not constitute "written evidence of Edna's overall

---

[3]    The elements of this claim are " ' "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance," ' " or, as more commonly stated, the party's reliance must have been "detrimental." (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 944–955.)

intent to disinherit Jan and Charles" because it left the decision to do so up to trustee Brito and attorney Black. In addition, the court observed that the 2002 letter spoke of "Edna's desire to have a relationship with all her children," which it found inconsistent with a conclusion that Edna had definitively decided to disinherit Charles and Jan.

In rejecting Jane's promissory estoppel claim, the court did not question that Edna made a promise to Jane on which she relied. Rather, it found that the promise was ambiguous and uncertain because witness testimony was inconsistent on exactly what trust assets Jane would receive. The court found that Jane's reliance was not reasonable because "Edna's overall desire to have contact with all her children, even during times her children caused her angst, indicated Edna's desire . . . not to disinherit [Charles and Jan] even if Jane provided care." It did not deem Jane's testimony credible that she elected to forgo moving back to Santa Cruz at a time when she could have purchased the veterinary clinic and worked full-time, which was one of her theories of detrimental reliance. The court, however, did not make findings about whether Jane also detrimentally relied on the promise by giving up her free time and personal space to care for Edna. Because Jane did not prevail on her promissory estoppel claim, the court declined to reach the merits of Charles and Jan's defense that Edna's promise was obtained through undue influence.[4]

## DISCUSSION

This appeal concerns whether Jane may be entitled to a larger share of Edna's estate than the trust documents contemplate. Jane claims that the

---

[4] Jane's appeal is authorized by subdivision (a) of Probate Code section 1304 and Code of Civil Procedure section 904.1, subdivisions (a)(1) and (a)(10).

8

probate court erred in rejecting the 2002 letter as a trust amendment to remove Charles and Jan as beneficiaries because it "unambiguously manifested [Edna's] intent" to do so based on their pursuit of involuntary conservatorships over her and her estate.  In the alternative, Jane maintains that the court erroneously rejected her promissory estoppel theory by misconstruing Edna's oral promise as ambiguous and giving short shrift to the impact that caring for Edna had on her personal life.  For their part, Charles and Jan assert that the 2002 letter was just an "instruction" to make an amendment "only if certain conditions were met."  As for Jane's allegations of error on her promissory estoppel claim, Charles and Jan adopt the trial court's findings and conclusions.

We apply settled standards of review to a judgment based on a statement of decision following a bench trial.  Questions of law are reviewed de novo, and the trial court's express and implied findings of facts made from conflicting evidence are reviewed for substantial evidence.  (*Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109.)  But "[w]hen the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court."  (*Ghirado v. Antonioli* (1994) 8 Cal.4th 791, 799.)

A.    *The 2002 Letter to Attorney Black*

Turning first to the significance of the 2002 letter, the trust stated that as its trustor, Edna could "amend the terms of the trust by [signing] a written instrument. . . . "  Jane maintains that the 2002 letter met this requirement to disinherit Charles and Jan because it expressed Edna's intent to remove as

9

beneficiaries any child who pursued a conservatorship against her after the letter was signed.[5]

"Before discerning what a trustor . . . intended by the specific language in a purported trust . . . document, as a general matter it must first ' "appear that [the] decedent intended to make a testamentary disposition *by that particular paper*, and if this cannot be shown it is immaterial that [her] testamentary intentions were . . . in conformity with it." ' " (*Trotter v. Trotter Van Dyck* (2024) 103 Cal.App.5th 126, 135.) In other words, " ' "it must satisfactorily appear that the maker of the instrument intended *by the very paper itself* to make a disposition" ' " of his or her property. (*Ibid.*) " 'The interpretation of a written instrument . . . presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue.' " (*Id.* at p. 134.)

Here, we agree with the trial court's conclusion that the 2002 letter did not amend the trust to disinherit Charles and Jan. The letter makes clear Edna's expectation that any amendment to disinherit one of her children for seeking a conservatorship could occur only upon Black's and Brito's subsequent exercise of their collective judgment generally, and specific determination, that any conservatorship being sought was not appropriate.

---

[5] Citing *Haggerty v. Thompson* (2024) 15 Cal.5th 729, Jane asserts that a formal trust amendment was not required. In that case, the court held that a trust may be modified by the procedures described in Probate Code section 15401, which include the trustor signing a writing other than a will and delivering it to the trustee. (*Haggerty*, at p. 733.) We do not reach this argument because, as we discuss momentarily, the 2002 letter did not *function* as an amendment, which makes the *form* of the ineffective amendment immaterial.

10

This discretion is reflected in Edna's use of the term "authorize" rather than "instruct" or "direct." That Black and Brito were "authorize[d]" to amend the trust did not require them to do so. (See *Estate of Briggs* (1964) 230 Cal.App.2d 592, 594; see also *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498.) Moreover, the remainder of the paragraph withdrew even that authority if Black and Brito believed a conservatorship was "appropriate." By requiring these additional steps before removing a child as a beneficiary, Edna did not intend for the letter *itself* to amend the trust. Because we "can ascertain [Edna's] intent from the words actually used in the instrument, the inquiry ends." (*Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949.)

## B.    *Edna's Oral Promise and Promissory Estoppel*

We disagree, however, with the probate court's rejection of the entirety of Jane's promissory estoppel claim. She asserts on appeal that staying in San Diego to be Edna's lifelong, live-in caretaker was an act or forbearance she reasonably undertook in reliance on Edna's unambiguous promise that she would receive her entire estate. As for her detrimental reliance, Jane stresses the impact taking on this responsibility had on her personal life.[6]

---

[6]    In our earlier opinion in *Lindsey*, we characterized Jane's petition as seeking the remedy of quasi-specific performance (i.e., ownership of trust assets themselves). (*Lindsey*, *supra*, D073145.) Among the differences between the doctrines of promissory estoppel and quasi-specific performance is that consideration by the promisee generally precludes a claim under the former (*Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 249–250) but is required to prevail on the latter (*Porporato v. Devincenzi* (1968) 261 Cal.App.2d 670, 674). Jane suggests that her agreement with Edna was a bargained-for exchange which, if that were the case, would likely prevent her from succeeding under promissory estoppel. Nonetheless, we proceed under this theory because Charles and Jan do not challenge Jane's invocation of it. In any event, our review of the record indicates that the elements of a claim for quasi-specific performance would likely be met.

11

Probate Code section 21700, subdivision (a)(4) authorizes courts to apply promissory estoppel to enforce oral contracts or promises to make a devise of property that are established by clear and convincing evidence. (*Id.*, § 21700, subd. (a)(4); Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1491 (1999–2000 Reg. Sess.) as amended Jan. 3, 2000, p. 4.) " '[P]romissory estoppel is an equitable doctrine [and] courts are given wide discretion in its application.' " (*Flintco Pacific, Inc. v. TEC Management Consultants, Inc.* (2016) 1 Cal.App.5th 727, 734.) Consistent with the substantial evidence standard of review, " '[t]he existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence.' " (*Ibid.*)

The probate court found that Edna's promise was not clear and unambiguous because the witnesses' testimony varied as to exactly what assets she planned to leave Jane. (See fn. 6, *ante* [stating elements of promissory estoppel].) We agree with the court's characterization of the testimony, but this uncertainty is not fatal to Jane's claim. It is true that the witnesses' recollections were inconsistent as to which assets *other than* the house Edna promised to leave Jane. But there was no dispute that Edna's expressions of her promise to Jane *always* mentioned the house. As the promise related to other assets, we must defer to the court's conclusion that Jane failed to establish by clear and convincing evidence which of them Edna intended to leave her. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581 [under substantial evidence review, "we accept all evidence supporting the trial court's order" and "completely disregard contrary evidence"]; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ["the [appellate] court must determine whether the record, viewed as a whole,

12

contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by [the clear and convincing standard] of proof"].) But there was no question that Edna intended for Jane to receive the house. Thus, that aspect of her promise was " ' "definite enough that a court can determine the scope of the duty" ' " as required to satisfy the first element of promissory estoppel.[7] (*Aceves v. U.S. Bank, N.A.* (2011) 192 Cal.App.4th 218, 226 (*Aceves*).)

Although the probate court was likely correct to question whether Jane reasonably relied on a promise to receive Edna's *entire estate* when she knew that Edna wanted to maintain relationships with all her children, Jane's reliance on a promise that she would receive the house does not raise those same concerns. Moreover, the facts were not disputed that Edna made her promise while facing the prospect of losing Jane's care and companionship during a time when her relationships with Charles and Jan were undeniably strained. It does not strike us as " ' "manifestly unreasonable" ' " (*Aceves*, *supra*, 192 Cal.App.4th at p. 227) under these circumstances for Jane to have relied on Edna's promise to leave her the house. And we have little difficulty finding that Jane's devotion of all her free time to Edna's care for the rest of

---

[7] In her objections to the probate court's proposed statement of decision, Jane pointed out that "[t]he testimony of all witnesses who Edna spoke to regarding her agreement with Jane was unequivocal as to Edna's promise to leave her residence to Jane." Jane also urged the court to revise its decision to reflect her entitlement to the house with "the remaining assets of the trust [to] be divided equally" between her, Charles, and Jan. The court did not entertain Jane's narrower request for relief in part because, in its view, she raised it too late. But courts have broad "discretion in promissory estoppel cases to fashion relief to do justice" (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 693), which means that the court could have considered whether an award of just the house to Jane was appropriate under the circumstances.

her life—also not disputed by Charles and Jan—was an action "of a definite and substantial character" as required for detrimental reliance. (See *C & K Engineering Contractors v. Amber Steel Co. Eyeglasses* (1978) 23 Cal.3d 1, 6.)

Accordingly, the probate court erred in ruling that Jane failed to establish the elements of promissory estoppel as to Edna's house. The court on remand must determine whether Jane procured that promise through undue influence. We express no opinion on what the outcome of that analysis should be.

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings to decide whether Edna's oral promise to Jane was the product of undue influence. Jane shall recover her costs on appeal.[8]

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

BUCHANAN, J.

---

[8] Because we have reversed the judgment and remanded, we need not consider Jane's additional argument that the judgment must be corrected. She is free to raise that issue on remand, if necessary.

14